Mary FLETCHER et al., Plaintiffs-
Appellants,

v.

HOUSING AUTHORITY OF LOUIS-
VILLE et al., Defendants-
Appellees.

No. 73-1466.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 15, 1973.

Decided Jan. 25, 1974.

David M. Kirstein, Louisville, Ky., for plaintiffs-appellants; Kurt Berggren, Legal Aid Society of Louisville, Louisville, Ky., on brief.

J. D. Raine, Louisville, Ky., Neal Knox, Atty., Dept. of Housing and Urban Development, Atlanta, Ga., for defendants-appellees; George J. Long, U. S. Atty., Louisville, Ky., William E. Grossman, Regional Counsel, Dept. of Housing & Urban Development, Atlanta, Ga., Zirkle, Raine, Francis & Highfield, Louisville, Ky., on briefs.

Before CELEBREZZE, EDWARDS and McCREE, Circuit Judges.

CELEBREZZE, Circuit Judge.

This appeal presents one of an increasing number of challenges to the administration of the federally funded housing program.[1] On November 27, 1972, the District Court dismissed Plaintiffs' request for declaratory and injunctive relief against the institution of a "rent range formula" by the Housing Authority of Louisville (HAL).[2] In brief, the formula allocates available apartments among eligible applicants so as to ensure accelerated entry of applicants who can pay higher rents than other applicants, thereby generating increased rental income for HAL. The decision below gives this policy legal sanction.

This case arises against the background of a previous District Court case, which invalidated HAL's arbitrary method of admitting people to public housing. Under a June 21, 1972 decision of the District Court for the Western District of Kentucky, HAL was ordered to halt its unconstitutional admission procedures and to agree "to make all decisions regarding the admission of applicants to all Louisville Housing Authority housing projects . . . based upon criteria which is [sic] consistent with HUD guidelines, and is [sic] concerned only with the date of application and the family needs of each applicant." Virginia Morris v. Housing Authority of Louisville, Civ. No. 6948 (W.D.Ky., filed June 21, 1972).

Once an applicant was found eligible for public housing, under the June 21,

1. The following decisions have involved successful challenges to the actions of the U. S. Department of Housing and Urban Development or local housing agencies: Thomas v. Housing Authority of Little Rock, 282 F. Supp. 575 (E.D.Ark.1967); Holmes v. New York City Housing Authority, 398 F.2d 262 (2d Cir. 1968); Thorpe v. Housing Authority, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); Cole v. Housing Authority of Newport, 435 F.2d 807 (1st Cir. 1970); Shannon v. U. S. Dept. of Housing and Urban Development, 436 F.2d 809 (3d Cir. 1970), noted in 85 Harv.L.Rev. 870 (1972); Hammond v. Housing Authority, 328 F.Supp. 586 (D.Or.1971); Crow v. Brown, 332 F. Supp. 382 (N.D.Ga.1971), aff'd., 457 F.2d 788 (5th Cir. 1972); Male v. Crossroads Associates, 469 F.2d 616 (2d Cir. 1972); Barber v. White, 351 F.Supp. 1091 (D.Conn.

1972); Davis v. Romney, 355 F.Supp. 29 (E.D.Pa.1973); Findrilakis v. Secretary of Dept. of Housing and Urban Development, 357 F.Supp. 547 (N.D.Cal.1973); and National Tenants Organization, Inc. v. Department of Housing and Urban Development, 358 F.Supp. 312 (D.D.C.1973).

2. After a trial on the merits of the permanent injunction, Plaintiffs' complaint was dismissed on November 27, 1972. On March 9, 1973, the District Court issued its Findings of Fact and Conclusions of Law. The Court found no violation of Plaintiffs' constitutional rights or of the National Housing Act. It considered the rent range formula a rational attempt to deal with HAL's financial problems. See Memorandum, Opinion, Order and Judgment, Civ. No. 7399–G (W.D. Ky., filed Mar. 9, 1973, amended Mar. 12, 1973).

District Court decree, he or she was placed on a chronological waiting list and advanced accordingly, subject to pre-emption by applicants in greater housing need.

On August 22, 1972, the Members of HAL's Board changed these admission procedures. Implementing the provisions of a Circular issued by the U.S. Department of Housing and Urban Development (HUD), HAL's Resolution stated:

"RESOLUTION NO. 51–72

WHEREAS, a review of the Ranges of Rents paid by tenants now occupying apartments operated by this Authority and a comparison with preliminary figures of the 1970 Census reveals the following:

| Rents Paid By Tenants | Percent of Units Now Rented in This Range | Distribution of Units Indicated in 1970 Census |
|---|---|---|
| From    To | | |
| $ 0 – $30 | 51.64% | 23% |
| $31 – $45 | 18.86% | 17% |
| $45 – $60 | 5.35% | 19% |
| $61 and over | 24.15% | 41%  ; and |

WHEREAS, the Public Housing Program made possible under the Housing Act of 1933 and its amendments, provided housing for the low-income segment of the population within established income limits of admission and continued occupancy determined by the Local Authority and approved by the Department of Housing and Urban Development; and

WHEREAS, the financial solvency of the Louisville Authority, because of housing a majority of its residents in income ranges extremely below the operating costs of the Authority, has reached a point where the solvency of the Authority is in jeopardy; and

WHEREAS, the Louisville Area Office of the Department of HUD has expressed a most urgent need for this Authority to increase its rental income sufficiently to meet its operating expenses in its letter dated July 24, 1972, a copy of which is attached hereto and made a part hereof the same as if copied in full herein; and

WHEREAS, it has been determined by the staff and the Department of HUD that the following Ranges of Rents would produce additional rental income to the Authority:

| Suggested Range of Rent | Percent of Units Recommended |
|---|---|
| From    to | |
| $ 0 – $30 | 30% |
| $31 – $45 | 20% |
| $46 – $60 | 20% |
| $61 and over | 30% |

NOW, THEREFORE, BE IT RESOLVED BY THE HOUSING AUTHORITY OF LOUISVILLE; That,

The manner of placing eligible applicants in vacant units operated by this Authority be maintained at a level approximating the following Ranges of Rents, in accordance with the existing Statement of Policies and Procedures Governing Admission to and Continued Occupancy of the HUD–Aided Projects:

| Suggested Range of Rent | Percent of Units Recommended |
|---|---|
| From    to | |
| $ 0 – $30 | 30% |
| $31 – $45 | 20% |
| $46 – $60 | 20% |
| $61 and over | 30% |

BE IT FURTHER RESOLVED THAT the establishment of Ranges of Rents and the Percentages applying thereto, as provided in this resolution, shall apply to those applicants on the priority list as well as non-priority applicants.

This resolution shall become effective when approved by the Department of Housing and Urban Development."

By instituting this "rent range formula", HAL made prospective tenants' ability to pay rent a key factor in determining which eligible applicants would receive Louisville's federally aided public housing and in what order. The discrimination against applicants in the

rent range between $0 and $30 emerges from a review of these figures:

| Mo. Rent | No. of Eligible Applicants as of Nov. 8, 1972 | Percentage of Total | No. admitted since rent ranges in effect, for Aug. 22 to Nov. 8, 1972 |
|---|---|---|---|
| $ 0 – 30 | 1103 | 68.6% | 54 |
| $31 – 45 | 221 | 13.8% | 47 |
| $46 – 60 | 126 | 7.8% | 35 |
| $61 – over | 157 | 9.8% | 30 |
| | (Total – 1607) | | (Total – 166) |

| Mo. Rent | No. admitted as percent of Total eligible in each range |
|---|---|
| $ 0 – $30 | 4.9% |
| $31 – $45 | 21.3% |
| $46 – $60 | 27.8% |
| $61 – over | 19.1% |

The final column of figures shows that for a period after the rent range formula was in effect, applicants in the $0 to $30 range faced much longer delays in obtaining public housing as compared with more affluent applicants.[3]

3. In full operation, the rent range formula would admit eligible applicants according to their ability to approximate the 30–20–20–30 distribution specified in the Resolution of August 22. Thereafter, admissions would be made on the basis of these quotas.

Within this procedure, all applicants in the $0 to $30 range would not be entirely foreclosed from public housing until the quotas were achieved. HAL keeps two waiting lists—priority and non-priority. Emergency need could justify giving a unit to a $0 to $30 rent range applicant instead of to one who could help HAL approximate its rent range goals but had no emergency need for housing. Nonetheless, all $0 to $30 applicants on the non-priority list would have to wait behind those in higher rent ranges until the desired distribution is approximated. This would mean that a more affluent eligible applicant who is equal to Plaintiff class in housing need but who applied long thereafter will be placed in a housing unit before an applicant in the $0 to $30 range.

4. It is impossible to tell precisely how long an extra delay will face any given applicant in the $0 to $30 rent range because of the August 22d Resolution. This will depend on how many more affluent applicants come forward, how many applicants drop off the list, and other factors. In estimating the possible delays involved, however, we can derive some indication from the evidence available.

Precisely how long Appellants' wait will be extended because of the institution of the rent range formula is not clear from the proceedings below. Based on evidence in the record, the extra delay occasioned by the August 22d Resolution to an Appellant obtaining public housing could be more than two years.[4]

Appellees argue that there is no discrimination occasioned by the rent range formula, since it is drawn to ensure that the public housing tenant body eventually reflects the percentages of persons in each rental group eligible to apply for public housing in Louisville.[5] We reject Appellees' contention for two basic reasons.

First, Appellees focus on the wrong groups when they look to the groups apparently eligible to apply for public housing. In determining the presence of discrimination, the relevant pools to

HAL operates 5,800 units with an annual turnover rate of 700. Transcript, Nov. 17, 1972, at 72. Before a non-priority applicant in the $0 to $30 rent range will be admitted, the 21.64% bulge such tenants currently represent over the allotted 30% for tenants in the $0 to $30 range must be reallocated to the higher rent ranges. This means that 1,255 applicants in the higher rent ranges must be jumped ahead of those in the lowest range. Assuming that at least 145 urgent cases will also arise in the space of two years, 1,400 applicants will be placed ahead of those in the $0 to $30 range who have already been found eligible and have been waiting in line. It would take two years to place this number in units as they become available.

5. HAL seems to contend that the rent range formula is merely a guideline. *See* Nov. 17 Tr., at 111, 123. We cannot accept this argument. If it were merely advisory, HAL would be injecting an arbitrary element into its admissions process, the very thing found illegal on June 21, 1972. *See* text, *supra.* We will not construe the Resolution to abridge the due process rights of applicants. *See* Holmes v. New York City Housing Authority, 398 F.2d 262 (2d Cir. 1968). Furthermore, such an advisory resolution would lead HAL officials to violate HAL's own regulations, as mandated by the June 21st District Court Order. We will not construe a Resolution as authorizing disobedience to an agency's own regulations.

be compared among the four rent ranges are those who have expressed an interest in public housing—those who have applied for it, not those who might apply. Granting automatic preferences to higher income applicants who might apply in the future over at least equally needy lower income tenants who have been on a waiting list is discriminatory. The rent range formula "vaguely smacks of a quota system," thus casting doubt on its constitutionality. Colon v. Tompkins Square Neighbors, Inc., 294 F.Supp. 134, 139 (S.D.N.Y.1968).

Second, we find that HAL's rent range Resolution imposes a significant penalty on the group of eligible applicants who have been on the waiting list for public housing since August 22, 1972. Cole v. Housing Authority of Newport, 435 F.2d 807, 811 (1st Cir. 1970). Cf. King v. New Rochelle Municipal Housing Authority, 442 F.2d 646, 648 (2d Cir.), cert. denied, 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971); but cf. Lane v. McGarry, 320 F.Supp. 562 (N.D.N.Y.1970). From their positions in line, they have been abruptly moved behind others of no greater housing need with a later application date— simply because these latter applicants can pay more rent. Shifting positions among those waiting in line for a limited supply of housing reinforces the injustice of a change which is itself unauthorized or unreasonable. Cole v. Housing Authority of Newport, 312 F.Supp. 692, 695 (D.R.I.), aff'd., 435 F.2d 807, 811 (1st Cir. 1970). Cf. United States v. Leahey, 434 F.2d 7, 11 (1st Cir. 1970); McGautha v. California, 402 U.S. 183, 273, 274, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) (Brennan, J., concurring).

■ Shuffling the order in which public benefits are to be allocated is not, standing alone, indefensible. Apportion-

ing scarcity requires flexibility for those administrators who perform that unenviable task. Dandridge v. Williams, 397 U.S. 471, 480, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Lindsey v. Normet, 405 U. S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). Given the harsh discrimination against those applicants who could pay only between $0 and $30 rent to HAL, our inquiry must be whether the rent range formula is an abuse of discretion by defendants. "It hardly need be said that the existence of an absolute and uncontrolled discretion in an agency of government vested with the administration of a vast program, such as public housing, would be an intolerable invitation to abuse." Holmes v. New York City Housing Authority, 398 F.2d 262, 265 (2d Cir. 1968). The basis for a change in admission policies must be reasonable and must be grounded in the purposes of the Act under which the administrative agency making such changes exercises its discretion. Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973). The lodestar of review of HAL's August 22d Resolution is the National Housing Act of 1937, as amended. We measure the rent range Resolution against the purposes of that Act for two reasons.

■ First, in contracting with HUD for annual federal subsidies, HAL agreed to function according to the terms of that Act.[6] Barber v. White, 351 F.Supp. 1091, 1093 (D.Conn.1972); Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973).[7] "When [federal] money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not by the states." Helvering v. Davis, 301 U.S. 619, 645, 57 S.Ct. 904, 910, 81 L.Ed. 1307 (1937) (Cardozo, J). Cf. Rosado v. Wyman, 397 U.S. 397,

---

6. HAL contracts with HUD under 42 U.S.C. § 1410.

7. In *Otero* the local agency claimed the right to violate its own regulations because of a statutory and constitutional obligation not to segregate tenant populations. The Second

Circuit held, "To the extent that the [local agency's] regulation conflicts with the Authority's duty to integrate, the regulation must yield." In the case before us HAL's August 22d Resolution must yield if it conflicts with either the Federal Constitution or the National Housing Act.

422–423, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) (Harlan, J., concurring).[8] The expression of federal policy in the area of low-income housing is the National Housing Act of 1937, as amended. So long as HAL operates under an annual contributions contract with HUD, it must meet the requirements of the National Housing Act. It may not set eligibility criteria unauthorized by Congress. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

Second, HAL's August 22d Resolution was the result of HUD's deliberate and steady pressure, which effectively forced HAL to implement the provisions of its Circular No. 7465.12 (reprinted as Appendix A). Under these circumstances, HAL's August 22d Resolution represents the Louisville culmination of HUD's attempt to enforce a nationwide policy of rent range provisions for public housing.

HUD argues that its Circular merely suggested that local housing agencies consider implementing a rent range scheme. For us to accept this argument as a reason for not reviewing HAL's rent range formula would be to blind ourselves to the realities of cooperative federalism in this case. The record is clear that the sole reason for HAL's implementation of HUD Circular No. 7465.12 was the desire to conform to HUD's wishes.[9] HUD's desire may not have taken the form of a formal requirement that HAL adopt a particular rent range formula. But it took the form of a demand through HUD's control over HAL's federal funding.

Nowhere in the Resolution itself or the testimony of HAL officials is it asserted that the rent range formula was desirable in the absence of a fiscal crisis. The rent range formula was passed to help alleviate HAL's financial straits and to justify HAL's request for operating funds from HUD. Thus, the actions of HAL are those of one arm of the federal housing program carrying out the wishes of the head. The Circular acquired federal force as it filtered into funding negotiations between HAL and HUD.[10] "[W]e think it clear that HUD does have the ultimate supervision and authority in carrying out the objectives of the Housing Act." Housing Authority of Omaha v. United States Housing Authority, 468 F.2d 1, 7 (8th Cir. 1972), cert. denied, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973).[11]

■ We do not conclude that any suggestion which HUD might make to local officials automatically subjects HUD's actions to judicial review. On the facts of this case, it is clear that HUD's actions made Circular No. 7465.-12 a matter of federal policy, not federal suggestion. HAL's original budget request for fiscal year 1972 was disapproved by HUD and was sent back for

---

8. In *Rosado*, Justice Harlan pointed out that the validity of a state's regulation in dispensing AFDC benefits depends on whether the state's action comports with the requirements of federal law.

9. Nov. 17, 1972, Tr. 55, 57, 72. HAL's Director of Management stated that the rent range formula had not been used previously "because it had not been approved for them to do so," by HUD. Tr., 57.

10. We do not confront the question whether the Circular should be considered a formal federal rule, for which publication and notice were required but not given by HUD. The Circular appeared to be non-mandatory on its face, so that its issuance may have been proper under the Administrative Procedure Act. As the Circular was enforced, however, HUD's actions proved that the Circular's policies would be carried out by HUD. It is HUD's actions in enforcing the Circular's provisions, not the issuance of the Circular, which are in question in this case.

11. HUD has the authority to "make, amend, and rescind such rules and regulations as may be necessary to carry out" the provisions of the Housing Act. 42 U.S.C. § 1408. "[W]here HUD determines that local authorities have failed to act or have acted in an inimical way to the objectives of the Act, . . . the ultimate authority is vested in HUD to set overall policy. When the latter occurs the real limitation to HUD's authority to act is whether its policies are reasonably related to carrying out Congress' expressed objectives to the low-rent housing program." 468 F.2d at 7, 8. *See* Hamlar, "HUD's Authority to Mandate Effective Management of Public Housing," 50 J.Urban L. 79 (1972).

redrafting. HAL made deep cuts in maintenance and other controllable cost items and proceeded to institute the rent range formula which HUD "suggested" in Circular No. 7465.12. HUD's disapproval of HAL's initial budget request, in the context of the Circular which urged local agencies "to immediately establish ranges of specified rents and to make admissions to [their] projects from among eligible applicants . . . as necessary to achieve, maintain, or improve the solvency of the operation," is a sufficient exercise of federal control to subject HUD's actions to judicial review. We cannot believe that if HAL had refused to implement a rent range formula or otherwise act to increase its operating income, HUD would have made up the difference in operating subsidies. Indeed, this would have undermined the reason for issuing the Circular.[12] HUD's action in enforcing its Circular, through its power to disapprove HAL's budget requests, subjects HUD's Circular to the test of compatibility with the National Housing Act.[13] Thorpe v. Housing Authority, 393 U.S. 268, 281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). "The courts may enjoin federal administrative action or inaction when it is violative of legislative enactments." Sloan v. United States Dept. of Agriculture, 335 F.Supp. 816, 820 (W.D.Wash.1971).

Given that HAL's rent range formula discriminates against a group of appli-

cants and that HAL's Resolution must be tested under the National Housing Act, we can uphold the rent range Resolution only if it is reasonable and is consistent with the Act. Manhattan General Equipment Co. v. Commissioner of Internal Revenue, 297 U.S. 129, 134, 56 S. Ct. 397, 80 L.Ed. 528 (1936). We conclude that Appellees' actions have not been consistent with the National Housing Act and that their implementation of Hud Circular No. 7465.12 constitutes an abuse of discretion under that Act.

▮▮ It is a basic rule of law that an exercise of administrative discretion not in accord with the agency's enabling legislation is invalid. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957). Otherwise, administrative agencies would be free to do as they please, rather than as the legislature authorized them to act. See Davis v. Romney, 355 F.Supp. 29 (E.D. Pa.1973); Sloan v. United States Dept. of Agriculture, 335 F.Supp. 816 (W.D. Wash.1971). It is a question of law for a court to decide whether an administrative action is reasonable and accords with its statutory foundation. Manhattan General Equipment Co. v. Commissioner of Internal Revenue, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936).[14]

---

12. Some indication of HAL's inability to obtain approval of its budget without implementing a rent range policy appears in the testimony of HUD Regional Director Maxwell: "In my judgment, rent ranges are absolutely necessary for the restoration of a financially sound position with local housing authorities." Oct. 4, 1972 Tr., 18. Given Mr. Maxwell's views, it is doubtful that HAL could have convinced him that its budget was sound within 42 U.S.C. § 1410, had it not passed its rent range Resolution.

HUD itself contributed to HAL's perception of the Circular as mandatory. The Circular stated that "increased efforts must be made by Local Authorities to achieve and maintain in their low-rent projects a cross-section of the low-income families in their localities." This is not language of mere suggestion.

13. HAL believed that the rent range formula could not be adopted without HUD's approval. This appears on the face of the August 22d Resolution (last sentence).

14. In *Manhattan*, the Supreme Court stated: "The power of an administrative officer or board to administer a federal statute . . . is . . . the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity. (citations omitted) And not only must a regulation in order to be valid, be consistent with the statute, but it must be reasonable." 297 U.S. at 134, 56 S.Ct. at 400.

Here the enabling legislation of HAL and HUD is the National Housing Act of 1937, as amended. To understand the incompatibility of HAL's rent range Resolution with the National Housing Act it is important to review the legislative history of that Act.

The National Housing Act of 1937 established a program of federal aid to local agencies engaged in providing decent housing to those who could not obtain it on the private market.[15] The basic purpose of the Act was

"to assist the several States . . . to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income." 42 U.S.C. § 1401.[16]

"Families of low income" was defined to mean "families . . . who are in the lowest income group and who cannot afford to pay enough to cause private enterprise . . . to build an adequate supply of decent, safe, and sanitary dwellings for their use." 42 U.S.C. § 1402(2). The Act authorized annual federal contributions to public housing agencies "to assist in achieving and maintaining the low-rent character of their housing projects." 42 U.S.C. § 1410(a).

Congress was aware in 1937 that "families of low income," those who would benefit from the Act, would actually not include the extremely poor.[17] The Act did not provide direct subsidies to the poorest of the poor but subsidized public housing operations. The limited extent of the subsidy meant that families with annual incomes of from $600 to $1,000 would be the primary beneficiaries.[18]

In subsequent years Congress struggled to extend the availability of public housing to all who needed it. Aware that World War II veterans' families, many of whom were on moderate incomes, were remaining in public housing after their need for public housing had ended, Congress passed the National Housing Act of 1949.[19] In its declaration of national housing policy, Congress made a commitment: "the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family." 42 U.S.C. § 1441. Congress declared it to be national policy that

"(4) governmental assistance to eliminate substandard and other inadequate housing through the clearance of slums and blighted areas, to facilitate community development and redevelopment, and to provide adequate housing for urban and rural non-farm families with incomes so low that they are not being decently housed in new or existing housing shall be extended to those localities which estimate their own needs and demonstrate that these needs are not being met through reliance solely upon private enterprise, and without such aid."[20]

The Department of Housing and Urban Development (then the Housing and Home Finance Agency) was ordered to exercise its powers in conformity with that policy.[21]

---

15. *See generally* N. Dorsen & S. Zimmerman, Housing for the Poor: Rights and Remedies (1967); 1949 U.S.Code Cong. Service, p. 1550.

16. Section 1 of the Housing Act of 1937. Sept. 1, 1937, c. 896, § 1, 50 Stat. 888.

17. Senator Wagner's responses to questions from Senator Pepper make this clear. Senator Wagner admitted, "there are some people whom we cannot possibly reach; I mean those who have no means to pay the rent minus the subsidy." . . . "I think [the bill] would be interpreted to mean the lowest income group that the bill can reach." 81 Cong.Record 8098–8099.

18. *See* H.Rept.No.1545, 78th Cong., 1st Sess., 6–7.

19. National Housing Act of 1949, July 15, 1949, P.L. 171, 81st Cong., 63 Stat. 429.

20. July 15, 1949, c. 338, § 2, 63 Stat. 413.

21. 42 U.S.C. § 1441 states:
    "The Department of Housing and Urban Development, and any other departments or agencies of the Federal Government having powers, functions, or duties with

The national housing policy declared in the 1949 Act made it clear that local housing agencies could not set minimum income limits for admission but must extend eligibility to all who could not purchase decent housing on the private market.[22] This policy was backed by a requirement that local agencies not discriminate against tenants on public assistance and a mandatory preference for those in the most urgent housing need.[23] A memorandum from the Housing and Home Finance Agency, relied upon during the Senate debates, stated that the preference for those in the most urgent housing need was "necessary in order to assure that the families with the very lowest income get a fair chance at the dwellings in a pubic housing project when it is first tenanted."[24] Under the 1949 Act, maximum income limits set by local agencies were made subject to federal approval.[25] Under Section 301 of the 1949 Act, local agencies were required to submit periodic reports that all their tenants were in fact poor and had come from inadequate housing.[26] To underline the urgency of its desire that all the ill-housed be well-housed the Congress provided that "Insofar as the provisions of any other law are inconsistent with the provisions of this Act, the provisions of this Act shall be controlling."[27]

The scope of federal subsidies was enlarged under the 1949 Act. Yet, because Congress did not assure that operating deficits would be covered by federal aid, local agencies were forced to institute rent ranges, to keep a balance between very poor and less poor tenants. Congress understood that this would happen in passing the 1949 Act, since a report of the Housing and Home Finance Agency was before it which predicted this result. Local agencies would charge more affluent tenants higher rents than lower income tenants, with "the average of these rents [sufficing] to pay project costs after Federal and local contributions have been received."[28] The rent ranges at that time thus increased the number of very low income tenants in public housing.

In 1961, Congress reacted to local housing agencies' financial pressures by authorizing special subsidies of up to $120 per elderly family housed by an agency, where an amount was determined necessary to enable the public housing agency to lease dwelling units to elderly families at acceptable rents and to operate the project on a solvent basis.[29] Another section of the 1961 Act repealed the maze of preferences and eligibility criteria, replacing it with the present 42 U.S.C. § 1410(g)(2):[30]

respect to housing, shall exercise their powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established."
As HUD contracts with local agencies and exercises its powers under the Act, it is bound by the following principle:
"No administrative body has authority to contract with a regulated corporation in a manner contrary to the statute which is being administered, nor in any way which does not give effect to the intent of Congress." Peoples Bank v. Eccles, 82 U.S. App.D.C. 126, 161 F.2d 636, 644 (1947), rev'd on other grounds, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948).

22. *See* Sen. Sparkman's remarks. 95 Cong. Record 4811 (1949).

23. *See* S.Rept.No.84, 81st Cong., 1st Sess. 19 (1949) ; U.S.Code Cong.Serv.1949, p. 1550;

95 Cong.Record 4810–11 (1949). The ban on discrimination against welfare recipients was repealed in 1961 as unnecessary. That such discrimination would be illegal is clear. Colon v. Tompkins Square Neighbors, Inc., 294 F.Supp. 134 (S.D.N.Y.1968). The mandatory preference for those in urgent housing need was melded in 1961 into the policies of 42 U.S.C. § 1410(g)(2).

24. 95 Cong.Record 4808–4809.

25. 42 U.S.C. § 1410(g)(1).

26. S.Rept.No.84, 81st Cong., 1st Sess., 19 (1949), U.S.Code Cong.Serv.1949, p. 1550.

27. 42 U.S.C. § 1443.

28. 95 Cong.Record 4808–4809.

29. Pub.L. 87–70, § 203 (1961), amending 42 U.S.C. § 1410(a).

30. Pub.L. 87–70, § 205(a) (1961).
"Under Section 10(g)(3), the local agency 'shall determine, and so certify to the Authority [(HUD)], that each family in the

"(g) Every contract for annual contributions for any low-rent housing project shall provide that—

\*　\*　\*　\*　\*　\*

"(2) the public housing agency shall adopt and promulgate regulations establishing admission policies which shall give full consideration to its responsibility for the rehousing of displaced families, to the applicant's status as a serviceman or veteran or relationship to a serviceman or veteran or to a disabled serviceman or veteran, and to the applicant's age or disability, housing conditions urgency of housing need, and source of income: *Provided,* That in establishing such admission policies the public housing agency shall accord to families of low income such priority over single persons as it determines to be necessary to avoid undue hardship;" 42 U.S.C. § 1410(g)(2).

This section speaks directly to the policies a local agency must follow in setting admission standards from among eligible applicants for federally aided public housing. Except for the veterans' preference, the criteria relate directly to housing need.

The special $120 subsidy provision of § 1410(a) was extended to include displaced families in 1964,[31] and to include

large families and families of "unusually low income" in 1968.[32] These subsidies were provided as a reaction to the increasing exclusion of the poorest housing applicants because of local agencies' financial problems.[33]

Despite Congress' expressed concern that applicants of very low income not be squeezed out of the competition for public housing, it became clear that inflationary pressures were forcing such a result.[34] Congress responded with the legal mandate that local housing agencies not attack their financial problems by shutting out the very poor. The first so-called Brooke Amendment limited the amount of rent that local agencies could charge a tenant, to one-fourth of his income.[35] Subsequent amendments tightened the definition of income by requiring that certain amounts be deducted before computing income.[36]

To compensate for the loss of rental income caused by the Brooke Amendments, Congress increased HUD's contract authorization and authorized HUD to make annual contributions that would cover the difference between operating costs and rental income.[37] A later amendment removed the statutory maximum on this latter authorization, thus authorizing HUD to pay whatever is required (1) to assure the low-rent character of the projects and (2) to achieve

project was admitted in accordance with duly adopted regulations and approved income limits.' Section 10(g)(4) requires that local agencies promptly notify those determined to be eligible for admission 'of the approximate date of occupancy insofar as such date can be reasonably determined.'"

31. Pub.L. 88–560, § 402 (1964). "Displaced families" became defined in broader terms. Pub.L. 88–560, § 401(b) amending 42 U.S.C. § 1410(g)(2).

32. Pub.L. 90–448, § 206(b) (1968).

33. H.Rept.No.1585, 90th Cong. 2d Sess. 32 (1968), U.S.Code Cong. and Admin.News 1968, p. 2873.

34. *See* DeLeeuw, Operating Costs in Public Housing—A Financial Crisis (Urban Inst. 1970), published in Hearings Before the Subcommittee on Housing and Urban Affairs of the Senate Banking and Currency Committee, 91st Cong., 2d Sess. 1063–1128 (1970).

35. Pub.L. 91–152, § 213(a), 83 Stat. 389, amending 42 U.S.C. § 1402(1).

36. Pub.L. 91–609, § 208(a), 84 Stat. 1778 (1970); Pub.L. 92–213, § 9, 85 Stat. 677 (1971), amending 42 U.S.C. § 1402(1).

37. Pub.L. 91–609, 84 Stat. 1776 (1970). Pub.L. 91–152, § 212(a), 83 Stat. 388, amending 42 U.S.C. § 1410(b). In authorizing payments to cover operating deficits, the Congressional intent was to remove the local agencies' economic justification for excluding the very poor. The Senate Report on the 1969 amendments stated:

"This section would enable families, regardless of how low their incomes are, to afford the rentals necessary to support project operating costs with no more than 25% of their income." S.Rept.No.91–392, 91st Cong. 1st Sess. 19 (1969), U.S.Code Cong. and Admin.News 1969, p. 1524. *See also* H.Rept.No.91–740, 91st Cong. 1st Sess. 30–32 (1969), U.S.Code Cong. and Admin.News 1969, p. 1524.

adequate operating and maintenance costs.[38]

In funding these programs Congress has appropriated a significant amount that is restricted to covering operating deficits. It has further appropriated additional funds which could be used to cover operating deficits caused by the congressional requirement that very low-income applicants not be excluded.[39] Since the Brooke Amendment has been in effect, according to Senator Brooke,

> "[S]ufficient funds were provided to make housing authorities 'whole' by eliminating past operating deficits and to insure that, in the future, public housing authorities would have sufficient funds to provide those services, repairs, and training programs which are essential if we are to honor the commitment of a 'decent home and suitable living environment for every American family.' "[40]

■ In view of the history of the National Housing Act, we conclude that tenant admission policies which discriminate against applicants because of their poverty are no longer justified.[41] Eligibility criteria unauthorized by Congress are not permissible when a state agency dispenses a federally funded benefit. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Local housing agencies' financial problems must be resolved through negotiation with HUD and by the funding decisions of Congress. Barber v. White, 351 F. Supp. 1091 (D.Conn.1972); National Tenants Organization, Inc. v. Dept. of Housing and Urban Development, 358 F.Supp. 312 (D.D.C.1973).

■ Discriminatory tenant admission techniques such as HAL's August 22d Resolution are forbidden under 42 U.S.C. § 1410(g)(2) and under the policies implicit in the Brooke Amendments.

42 U.S.C. § 1410(g)(2), supra at n. 30, requires local housing agencies to give "full consideration" to the basic criterion of housing need.[42] By making

---

**38.** Pub.L. 92–503, 86 Stat. 906 (1972), amending 42 U.S.C. § 1410(b). *See also* Housing and Urban Development Act of 1970, Pub.L. 91–609, § 210, 84 Stat. 1778 (1970), amending 42 U.S.C. § 1410(a). HUD's contract authority has been amply increased in recent years. *See* National Tenants Organization, Inc. v. Dept. of Housing and Urban Development, 358 F.Supp. 312, 316, n. 7 (D.D.C.1973).

**39.** HAL admits that "while Congressional Appropriations have sought to keep pace with local needs, the Executive Branch of the Federal Government has not released adequate funds to local authorities." Appellee HAL's Brief on Appeal, citing p. 10 of the District Court's Memorandum Opinion. *See* National Association of Housing and Redevelopment Officials v. Romney, Civ. No. 2080–72 (D.D.C. Mar. 21, 1973).

There is no proof in the record that the deficits which HAL projects are not due to inefficient management or other controllable matters short of establishing a rent range system. Congress intended HUD to force better management techniques on local housing authorities. *See* n. 47, *infra*. But this intent cannot justify an improper means of achieving that result. Davis v. Romney, 355 F.Supp. 29, 44 (E.D.Pa.1973).

**40.** Remarks of Senator Brooke, 116 Cong. Record 24, 298, July 15, 1970.

**41.** Having concluded that HAL's August 22d Resolution is inconsistent with the National Housing Act, we need not consider whether the rent range formula is otherwise "reasonable." We have doubts whether it is. *See* Thomas v. Housing Authority, 282 F. Supp. 575 (E.D.Ark.1967).

**42.** There is no indication in the record that HAL's August 22d Resolution was taken after "full consideration" of its impact on the factors listed in § 1410(g)(2). Furthermore, HAL's Resolution was passed without prior notice and hearing, and HUD's Circular 7465.12 was issued with no prior notice or opportunity of interested parties to voice objections. Since HAL's Resolution constitutes a rule of an arm of the Federal Government, we have doubts whether its promulgation was proper under the Federal Administrative Procedure Act. *See* Buckeye Power, Inc. v. Environmental Protection Agency, 481 F.2d 162 (6th Cir. 1973). At least a showing that HAL "fully considered" the factors Congress ordered it to consider might be necessary. *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Were we otherwise to find the

the factor of one's ability to pay a higher rent than another applicant a central feature of its admissions policies, HAL has introduced a criterion wholly extraneous to those specified in § 1410(g)(2). The rent range formula not only ignores housing need but actually discriminates against those in greatest need.[43]

Appellees cite no statutory or constitutional provision that would allow them to disregard the criteria of date of application and housing need, which HAL is under a court order to recognize as the exclusive criteria for admission of eligible applicants.[44] Appellees' argument that HAL would go bankrupt if the rent range formula is not implemented, even if an accurate forecast, does not compel a contrary conclusion. HAL's bankruptcy would be a proper legal outcome, should Congress and Kentucky authorities will it so by not appropriating sufficient funds to avoid that result. Barber v. White, 351 F.Supp. 1091 (D.Conn.1972). *See* Pozen, "The Financing of Local Housing Authorities: A Contract Approach," 82 Yale L. J. 1208, 1216–17 (1973).

• Appellees try to justify HAL's August 22d Resolution on other grounds.

■■■ First, they argue that § 1402(1) authorizes HAL to take its fiscal solvency into account in setting its admission policies. Under § 1402(1), maximum income limits and rents "shall

be fixed" by the local housing agency "and approved" by HUD

> "after taking into consideration (a) the family size, composition, age, physical handicaps, and other factors which might affect the rent-paying ability of the family, and (B) the economic factors which affect the financial stability and solvency of the project." 42 U.S.C. § 1402(1).[45]

This provision relates solely to fixing rents and setting maximum income limits for eligibility. It does not apply to admissions priorities among those already found eligible. These two areas of agency policy have been clearly distinguished by Congress, which has treated rent levels and eligibility in sections 2(1) and 10(g)(1) and has handled admission policies under section 10(g)(2). Indeed, HAL's ability to refer to "the economic factors which affect the financial stability and solvency of the project" in deciding on maximum income limits for eligibility and rent levels undermines its assertion that its only means of avoiding financial disaster is to juggle admission priorities among eligible applicants. Likewise, cases cited by HAL wherein courts have refused to interfere with local agency decisions on rent levels [46] are simply not relevant to the question of admission priorities. ·These decisions affirm HAL's discretion in fixing rents as a means of generating

---

rent range Resolution in conformity with the National Housing Act, a remand could be necessary because of possible procedural defects.

We do not remand for compliance with procedural rules because of our finding that HAL's rent range regulation is substantively invalid under the National Housing Act.

43. Evidence in the record indicates that at least some applicants in the $60 and over range can afford decent private housing. One witness stated, without challenge, that she places people in standard private housing at $50 per month, excluding heat and utilities. Nov. 17 Tr., 40. The rent range system, according to this witness, would place "hundreds of families . . . at the mercy of substandard housing." Nov. 17 Tr., 42.

44. *See* text *supra* at p. 795.

45. *See* House Comm. on Banking and Currency, 93d Cong., 1st Sess., Supplement (with Amendments through Feb. 2, 1973) to Basic Law and Authorities on Housing and Urban Development, dated Jan. 31, 1971 (Comm. Print Mar. 31, 1973).

46. Appellees cite Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970). *But see* Burr v. New Rochelle Municipal Housing Authority, 347 F.Supp. 1202 (S.D.N.Y.1972), modified, 479 F.2d 1165 (2d Cir. 1973). We agree that rent level decisions are complex and require that flexibility be given administrative decision-makers in this area. Rent levels, however, is not the question before us.

income. Setting rents demands far more deference to administrative expertise than deciding admission priorities.

■■ Second, HAL invokes the broad principle of local autonomy in Section 1 of the Act:

"It is the policy of the United States to vest in the local public housing agencies the maximum amount of responsibility in the administration of the low-rent housing program, including responsibility for the establishment of rent and eligibility requirements (subject to the approval of [HUD]), with due consideration to accomplishing the objectives of this chapter while effecting economies." 42 U.S.C. § 1401.

This statement evinces Congress' intent to give maximum responsibility over rent, eligibility, and similar decisions to local housing agencies, subject to the policies of the Act.[47] It does not speak directly to admission policies. Even if admission priorities were within the group of decisions to which deference should be given to local expertise, the priorities set forth in HAL's August 22d Resolution were effectively mandated by HUD as a national policy. Appellees cannot claim that the rent range formula represents a *bona fide* exercise of local autonomy, geared to peculiar local needs, when the impetus for the rent range formula came from HUD.

■ Thus, we are left with the stark assertion that HAL may take its August 22, 1972 action simply to relieve its fiscal stress, though no statutory language credits this rationale in establishing admission procedures.[48] It is on this point that the legislative history of the National Housing Act is pointedly against Appellees' contentions.

The 1969 Congressional debate on the Brooke Amendment expresses a clear Congressional policy that HUD ensure the low-rent character of public housing and that local agencies not handicap applicants because of their poverty.[49] In view of this legislative history, it is inconceivable that Congress could have intended that local housing agencies should have the authority systematically to allocate apartments based on one applicant's ability to pay a higher rent than other applicants. By limiting what a public housing tenant could be forced to pay to one-fourth of his income, Congress sought to ensure that a "reverse means test" would not be required by local housing agencies in allocating public housing among eligible applicants. Barber v. White, 351 F.Supp. 1091 (D. Conn.1972); National Tenants Organization, Inc. v. Dept. of Housing and Urban Development, 358 F.Supp. 312 (D. D.C.1973).

The incompatibility of HAL's August 22d Resolution and the National Housing Act can be seen by taking the next logical step under Appellees' analysis. If HAL may give *some* priority to certain applicants over those equal in all respects except the ability to pay rent, then HAL could provide that the applicant who could pay the highest amount of rent would be admitted first, regardless of other factors. There is no inherent legal difference between favoring more affluent applicants through a discriminatory quota system and favoring more affluent applicants through an absolute preference. Both procedures would be defended as within the local

---

47. In 1970 the phrase "with due consideration . . ." was added to emphasize that local agencies must conform with the basic policies of the Act. Housing and Urban Development Act of 1970, Pub.L. No. 91-609, 84 Stat. 1770 (1970). *See generally*, Lefcoe, "HUD's Authority to Mandate Tenants' Rights in Public Housing," 80 Yale L.J. 463 (1971).

48. A local housing authority made the same argument in Cole v. Housing Authority of Newport, 435 F.2d 807 (1st Cir. 1970). It argued that a two-year residency requirement was justified as a means of "effecting economies". The Court rejected this contention.

49. *See* S.Rept.No.91-392, 91st Cong., 1st Sess. 19 (1969); U.S.Code Cong. and Admin. News 1969, p. 1524; H.Rept.No.91-740, 91st Cong., 1st Sess. 30-32 (1969); U.S.Code Cong. and Admin.News 1969, p. 1524. *See* text, *supra*, at ns. 37-40.

agency's discretion and as reasonably related to HAL's financial solvency. Indeed, the absolute preference for more affluent applicants would be more effective in achieving HAL's desire to balance its budget.

An absolute priority for more affluent applicants would gut the intent of the Brooke Amendment and the 1970 amendment which instructed HUD to alleviate local public housing agencies' operating deficits and "assure the low-rent character" of the units. The priority system which the August 22d Resolution of HAL embodies is equally inconsistent with the purposes of the National Housing Act. In short, Congress intended no reverse means test that favors more affluent over poorer applicants for public housing.[50] Under the present National Housing Act, any system which purposely and effectively embodies such a preference is beyond a local public housing agency's discretion to enact and beyond HUD's proper discretion to require or enforce.

50. This conclusion does not mean that Congress intended to favor the "lowest of the low" income tenants. We need not confront Appellants' attempt to show that the lowest income applicants must be given priority over equally needy applicants who can afford to pay higher rents.

51. In 1972 the House Committee on Banking and Currency originally proposed an additional $200,000,000 for operation subsidies conditioned on local housing authorities' implementation of "effective management procedures," including the following:

"The establishment of tenant eligibility criteria which, within a reasonable period of time will assure that the project will include families with a broad range of incomes and will avoid concentrations of very low-income and socially deprived problem families."

This proposal did not receive a rule from the House Rules Committee. Instead, the eventual enactment provided an additional $150,000,000 for the public housing program in the year 1973. This was described by Chairman Patman of the House Banking and Currency Committee as "a bare bones authorization for the public housing program, . . . needed to keep the program operating during this current fiscal year". The Congressional intent that HUD not force

If the fiscal crisis of local public housing agencies grows sufficiently severe, Congress may face a choice between forcing some public housing agencies out of business or of loosening the constraints which it has imposed on public housing authorities. But this is not the only choice. Congress may choose to appropriate enough funds to keep the present units in operation under the current provisions of the National Housing Act, and force HUD to release moneys for that purpose. Or Congress may choose to allow HAL to do what HUD urged it do to in this case. In 1972, an amendment to condition HUD's annual contributions on a local housing authority's establishment of a rent range formula was proposed. It was not approved.[51] HUD will have to win Congressional approval before it may again try to implement such a preference for more affluent applicants. It cannot do on its own what it failed to win from the Legislature. Having found that HAL's rent range Resolution as applied exceeds the lawful discretion which Ap-

local housing agencies to implement rent range formulas is provided by the comment of a supporter of the rent range idea, immediately before the House approved the $150,000,000 authorization without the rent range provision included:

"While the absence of [the rent range] provision in the resolution means that HUD cannot legally so condition operating subsidies, it should be clear that the great majority of the House Banking and Currency Committee members desire HUD to take a stronger stance in encouraging improved management." (Rep. Barrett)

Thus, Congress did not approve the rent range formula as a technique of fiscal management, in full awareness that the absence of such a provision foreclosed HUD from instituting rent range procedures on its own. Instead, Congress authorized additional funds for operating subsidies and urged HUD to take other actions to encourage more efficient management of public housing. *See* debate on H.Res. 1165, Cong.Record, Oct. 14, 1972, H. 10067–68.

We note that the House Report accompanying the proposed Housing and Urban Development Act of 1972 (H.Rept.No.92–1429, 51) supported this amendment for reasons apart from the strictly financial ones on which HAL based its August 22d Resolution.

pellees exercise under the National Housing Act, we need not reach Appellants' constitutional objections to the rent range formula. The decision of the District Court is reversed. This cause is remanded for summary relief consistent with this opinion. No costs are to be taxed.

APPENDIX A

U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
HOUSING MANAGEMENT

TRANSMITTAL NOTICE No. 12          HM 7465.12
                                         6/2/71

1. *This Notice Transmits the Following*:
   Circular HM 7465.12, Housing a Cross-Section of Low-Income Families in Low-Rent Public Housing, dated 6/71.

2. *Explanation of Material Transmitted*:
   Cites need for increased efforts to attain objectives of socially and financially sound programs and clarifies LHAs' role in achieving these objectives.

3. *Filing Instructions*:
   File directly following Circular HM 7465.11, dated 5–13–71.

                    /s/ G. RICHARD DUNNELLS
                         Assistant Secretary for
                         Housing Management

DISTRIBUTION: A and B–3, 6, 9, 23 (LHA's)
              E–3, HA–8, I–1
              W–1, W–2, W–3, W–3–1, W–4
              R–1, R–2, R–3, R–3–1 (HMCS), R–5

U. S. DEPARTMENT OF HOUSING AND URBAN
           . DEVELOPMENT
         HOUSING MANAGEMENT

CIRCULAR                          HM 7465.12
                                         6/2/71

SUBJECT: Housing a Cross-Section of Low-Income Families in Low-Rent Public Housing

1. PURPOSE. The purpose of this Circular is to bring to your attention the continuing concern of this Department over excessively high operating costs and, in some instances, deplorable deterioration of low-rent public housing projects and the environment in which tenants live. Sharp increases in vandalism and crime, accompanied by the move-out of many families still eligible for and in need of public housing, have resulted in either, or both, high vacancy rates or concentrations of the lowest income families, many with serious problems.

2. OBJECTIVES. To advance our objective of socially and financially sound local programs, increased efforts must be made by Local Authorities to achieve and maintain in their low-rent projects a cross-section of the low-income families in their localities. HUD staffs will, of course, provide all possible assistance, upon request.

3. ESTABLISHMENT OF RENT RANGES

   a. *Each Local Authority having a graded rent system*, if it has not already done so, is urged to immediately establish ranges of specified rents and to make admissions to its projects from among eligible applicants at such rents or within such ranges of rent as may be necessary to achieve, maintain, or improve the solvency of its operation and to insure, insofar as is possible, serving a representative cross-section of the low-income families in its locality.

   b. *There has been some question* as to whether the application or admission preferences at specified rents or within specified ranges of rent is consistent with the objectives of Title VI of the Civil Rights Act of 1964 and HUD regulations and requirements pursuant thereto. You are advised that admission preference may be extended by a Local Authority in this manner:

      (1) If its *adopted* admission regulations so provide, and

      (2) If such action would not result in the *exclusion* of applicants of a particular race, color, or national origin.[1]

---

1. Language in the adopted admission policies to accomplish this purpose might state:. Tenants will be selected from among applicants eligible for dwellings of given sizes and within such ranges of rent as may be established from time to time to ensure the financial solvency and stability of the program, in the following order . . . [specify particular preference order established by the Local Authority]

c. *Among the actions* which Local Authorities should take immediately to improve or promote a better economic and social cross-section in its tenant body are to:

(1) Review and analyze its application intake and pool and take steps to stimulate interest in and increase applications from more wage earner and two-parent families having greater potential for stability.

(2) Review income limits for admission and continued occupancy and take action, as necessary, to establish them at appropriate levels.

(3) Attempt through all practicable means to retain stable eligible and overincome families in occupany until such time as they are, in fact, able to obtain standard housing within their ability to pay.

4. OCCUPANCY STANDARDS

a. *The Circular dated 12-17–68* on "Admission and Continued Occupancy Regulations for Low-Rent Public Housing," advised Local Authorities that recent court decisions, while holding that a Local Authority might not deny admission or continued occupancy to a family solely on the basis of the presence of an out-of-wedlock child or children, or moral judgments, also reaffirmed a Local Authority's right to establish standards for admission and occupancy that will protect the health, safety, morals, and comfort of public housing tenants. Specifically, this Circular stated:

"A Local Authority shall not establish policies which *automatically* deny admission or continued occupancy to a particular class, such as unmarried mothers, families having one or more children born out of wedlock, families having police records or poor rent-paying habits, etc. "To determine whether applicants or occupants *should be admitted to or remain in its projects,* a Local Authority may establish criteria and standards bearing on whether the conduct of such tenants (in an applicant's present or prior housing, or in occupancy, in the case of present tenants) does or would be likely to interfere with other tenants in such a manner as to materially diminish their enjoyment of the premises. Such interference must relate to the actual or threatened conduct of the tenant and not be based solely on such matters as the marital status of the family, the legitimacy of the children in the family, police records, etc." [emphasis added]

b. *Local Authorities clearly, therefore, have the right* to determine, under appropriate criteria, whether applicants or occupants should be admitted to or remain in their projects.

c. *The right of any rejected applicant,* or of any tenant to be evicted, to a hearing or a review of grievances would not be affected. HUD policies concerning notifications to applicants and grievance procedures are contained in Circular HM 7465.5 dated 6–24–70 and Circular HM 7465.9 dated 2–22–71.

EDWARDS, Circuit Judge (dissenting).

The Louisville Housing Authority's admission policy which is attacked by appellants seems to me to be bad social planning. I do not, however, believe that it is outside the broad grant of authority established by Congress in the applicable federal housing legislation (42 U.S.C. § 1401 et seq. (1970) ). Nor do I believe that the United States Con-

**810**

stitution requires Congress in attacking a great social problem like that of providing adequate shelter to those Americans unable to afford decent housing to wait until it can do the whole job at once. Nor do I think the Constitution requires Congress to start at any particular point in the spectrum of need.