Jane **FINDRILAKIS** et al., Plaintiffs,

v.

The **SECRETARY OF the DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,** Defendant.

Margaret **LARSON** et al., Plaintiffs,

v.

George **ROMNEY** et al., Defendants.

Civ. Nos. C–72–801, C–71 2429.

United States District Court, N. D. California.

Jan. 16, 1973.

A. Keith Lesar, Legal Aid Society of Santa Cruz County, Watsonville, Cal.,; Peter H. Weiner, Cal. Rural Legal Assistance, Gilroy, Cal.; Fred H. Altshuler, Cal.Rural Legal Assistance, Cooperative Legal Services Center, San Francisco, Cal., David B. Bryson, National Housing and Economic Development Law Project, Berkeley, Cal., for plaintiffs in Findrilakis.

Fred H. Altshuler, CRLA Cooperative Legal Services Center, San Francisco, Cal., David B. Bryson, National Housing and Economic Development Law Project, Berkeley, Cal., and Raymond Shonholtz, Legal Aid Society of Monterey, Seaside, Cal., for plaintiffs in Larson.

James R. Brown, U. S. Atty., San Francisco, Cal., and Peter Shackter, Asst. U. S. Atty., for defendants.

## MEMORANDUM AND ORDER

PECKHAM, District Judge.

Named plaintiffs, in these two actions which raise identical issues, applicants for tenancy in several housing projects in Gilroy, Santa Cruz, Marina, and Morgan Hill, California, and the non-profit sponsor of one of those projects seek to have a circular issued by the Department of Housing and Urban Development HM No. 4442.18 declared inconsistent with the National Housing Act and to enjoin its enforcement. The defendants in C–72–801 have moved for summary judgment. The facts are not in dispute. The circular sets forth as a mandatory requirement for eligibility in a Section 236 rental subsidy housing project [1] that a prospective tenant's rent to "adjusted" income ratio be less than 35%. The drastic effect in restricting the market of eligible tenants for § 236 projects is illustrated by the fact that almost half the present occupants of those projects would be ineligible for admission if they applied today.[2]

The main thrust of plaintiffs' complaint is that this eligibility requirement with its extensive reliance on "adjusted" rather than actual income and its inflexible approach in determining eligibility does violence to Congress's mandate that the § 236 program be administered "so as to accord a preference to those families whose incomes are within the lowest practicable limits . . . ."[3] Jurisdiction is founded on 28 U.S.C. §§ 1331, 1337, 1361, 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 2201, 2202.

Plaintiffs bring this action on behalf of themselves and all others similarly

---

1. 12 U.S.C. § 1715z–1.

2. The circular by its terms excludes present occupants from its purview. The affidavit of the manager of the Gilroy apartment states that over 50% of the present occupants would be ineligible under the circular, yet there is no problem with payment of rent. See also, Summary Management Team Review of Section 236 Program which states that the average present § 236 tenant pays about 34% of adjusted income as rent.

3. 12 U.S.C. § 1715z–1(i)(2).

situated who desire housing in a § 236 project but by virtue of their income and family situation are deemed ineligible for admission to Villa San Carlos, Gilroy, or other projects, solely because of the circular. Plaintiffs are generally welfare recipients who have demonstrated their ability to pay consistently comparable rents to those required in the projects. The affidavits of the managers of these projects make clear that the sole reason for refusing the applications is HM No. 4442.18. Plaintiff Mexican Americans United for Progress (MAUP) brings this action as a nonprofit sponsor of a § 236 project allegedly having its market unduly restricted.[4]

It is a question of law for the reviewing court to determine whether a regulation is in harmony with the statute. Kay Lem Jew v. Mitchell, C–71–2182 RFP (N.D.Cal. decided April 19, 1972). While deference is due the agency charged with the administration of a statutory scheme, Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), it is the duty of this court to declare invalid a regulation which frustrates congressional intent. Manhatten G. E. Co. v. C. I. R., 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936). The main question then becomes is this circular a reasonable attempt to define the lowest income practicable, or does it exclude from eligibility in the projects the very people Congress mandated a preference be accorded.

Three factors lead to the conclusion that the circular is not a reasonable attempt to give substance to the term lowest practicable limits. First, the 35% figure was chosen for the avowed purpose of keeping those eligible for public housing out of the § 236 projects despite Congress's intent that there should be substantial overlap in the public housing and § 236 programs. Second, because the administrative record, as determined by the Secretary, far from offering any basis for supporting the Secretary's inferences that the circular is necessary to prevent increasing defaults in the program, affirmatively demonstrates the contrary. And third, because reliance on "adjusted" rather than actual income in measuring the ability to meet rental payments and the circulars inflexible approach does not reflect a reasonable attempt to define lowest practicable limits.

## I.

Section 201 of the Housing and Urban Development Act of 1968 established a new section 236 of the National Housing Act which provides monthly payments to mortgagees in order to reduce costs of rental and cooperative housing by paying part of the interest on the mortgage. Eligibility for assistance is generally limited to families whose incomes fall below 135% of the maximum limit established for public housing eligibility,[5] but in no case in excess of 90% of the limits prescribed for occupancy of projects financed by § 221(d)(3).[6]

At the very outset of the Congressional debates over § 236, H.U.D. was severely criticized for directing prior housing projects toward moderate rather than lower income families. Hearings before the Subcommittee on Housing and Urban Affairs of the Senate Committee on Banking and Currency, 90th Cong., 2d Sess., 2, 26, 32, 35, 42, 61–63 (Senate Hearings). House Bill 17989 supported by the Administration, designated "Rental and Cooperative Housing for *Low and Moderate* Income Tenants" was rejected by the Conference Committee in favor of Senate Bill 3479 designated "Rental and Cooperative Housing

---

4. MAUP also seeks standing on behalf of its membership who desire housing in the project it is sponsoring. While some question has been raised as to the sufficiency of the allegations in the amended complaint to assert the claims on behalf of its members, see NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), the question is only academic as MAUP has standing as a non-profit sponsor, and the other named plaintiffs have standing to assert the claims made herein.

5. 42 U.S.C. § 1402(2), § 1415(7)(b)(ii).

6. 12 U.S.C. § 1715*l*(d)(3).

for *Lower* Income Families" which eventually passed.[7] More substantively, to fight the tendency of these programs to serve moderate income families, Congress amended the administration bill by setting statutory maxima for income eligibility. It further provided that only 20% of the interest reduction payments under § 236 may be for families whose income exceeds 135% of the public housing maxima. 12 U.S.C. § 1715z–1(i)(2). It set *no minimum level* of income but instead provided a preference to be given to "those families whose incomes are within the lowest practicable limits." 12 U.S.C. § 1715z–1(i)(2).

There can be no doubt that the § 236 program is aimed at lower income families including those eligible for public housing and that the two programs envision substantial overlap. Senate Hearing 32. Nonetheless it is one of H.U.D.'s avowed purposes in promulgating the circular to direct those eligible for public housing out of the § 236 program. Assistant Secretary Watson's Memorandum of January 10, 1972 to Under Secretary Van Dusen states the 35% figure had been chosen in order that "Section 236 program would be structured mainly to serve families who earned too much for public housing but not enough . . . to otherwise afford decent housing."

## II.

In light of H.U.D.'s avowed purpose to direct those eligible for public housing away from § 236 projects, despite Congress's intent that the two programs should overlap, H.U.D.'s claim that the circular is necessary to prevent defaults must be viewed in a jaundiced light. H.U.D. argues "the presence of very low income non-rental supplement tenants in a Section 236 Project would seriously hamper the project's ability to absorb increased operation expenses and could lead to an increasing number of defaults and thereby jeopardizing the program."

While it is true that the default rate in § 236 projects increased from 6.7% to 11.7% from October 31, 1971 to March 31, 1972, there is no evidence in this record to pinpoint the cause. Instead the court is asked to affirm on this and no more, that these defaults were due to the inability of low income tenants to meet rental payments. In order to do this a two-step inference is required. First is that the defaults are due to non-payment of rent by tenants as opposed to high operating expenses, vandalism, poor management, poor site location, and inadequate rental markets. The inference upon the first inference is that if the defaults are due to non-payment of rent, the reason that the rent was not paid was because the tenant's income was too low when he was admitted into the project as opposed to fluctuations in income, over extentions of credit or rent strikes.

If there was evidenced in this record a substantial connection between the presence of low income tenants and the defaults, using actual income as a measure, the aim of the circular would be in reasonable furtherance of the statutory goals. No such evidence is present.

In the affidavit of Fred Pfaender, Deputy Director Office of Housing Programs, Office of Housing Management, H.U.D., he describes himself as personally preparing HUD Circular 4442.18 and aware of the reasons for its adoption. He indicated the record on which he based his decision which essentially boils down to the increasing default rate and two Reports. (Audit Report and a HUD Management Team Review.)

The Audit Report noted that operating expenses had generally been underestimated and inevitable increases in rent often follow. Tenants paying high percentages of their rent could not in all probability, the Report speculates, absorb the increase. While this might seem to argue for better estimations of rent charges based on better estimates of operating expenses, it hardly supports

---

7. (emphasis added). 1968 U.S.Code Cong. & Admin.News, p. 2873.

excluding of tenants otherwise eligible on the conjecture that rent might increase. The Report cites no present examples of defaults due to non-payment of rent by low-income tenants, but merely conjectures about the possibility of default if rent charges are underestimated and tenants cannot absorb the increase. The poor estimates of operating expenses may provide an explanation for increasing defaults apart from the presence of low income tenants.

The Management Review concluded: *"The majority of managers are carefully screening all Section 236 tenants as to credit record and relatively few problems are being encountered with payment of rent."*

"Rental arrears are more of a problem in San Francisco than in the other cities reviewed" but San Francisco had the lowest average adjusted income ratio— 28% (S.F. Review 2, 5) while San Diego had the highest income ratio of 38% no projects were in default.

While the Review supports findings of management incompetency with respect to tenant orientation, social service programs, and recreational activities, there is a finding that they are carefully screening credit applications and non-payment of rent is not a problem. The Review also found "[r]ent collection procedures are strict with late charges and prompt eviction being the rule."

Finally the Review confirms the argument that any of the difficulties in the § 236 projects are founded in problems other than inability of low income tenants to pay rent. Dallas and Pittsburgh had insufficient markets (Dallas Review 2, Pittsburgh Review 2, Summary 1). It is hard to understand how further restriction of the eligible market will prevent defaults due to insufficient markets. Pittsburgh had a high crime rate, inadequate security, and vandalism. (Pittsburgh Review 3). San Francisco and Dallas projects were poorly situated with respect to public transportation. (S.F. Review 11, Dallas Review 4). San Francisco and Indianapolis had inadequate recreational facilities which tended to promote vandalism. (Ind. Review 4, S.F. Review 4, 9).

Locational decisions have been a major factor in the § 236 projects failure to attract an economic mix. Because many of the projects are located in "tough" neighborhoods, and high crime areas, they have not been able to attract tenants willing to pay the fair market value. In one case the Tierra Nuestra project in San Jose rental arrears was a problem. The project has been allowed to deteriorate into a slum-like condition. The tenants represented by Community Legal Services have been engaged in a rent strike.

Plaintiffs submitted affidavits from the managers of the two existing projects in which named plaintiffs seek admission. Fifty per cent of the present tenants would be ineligible under the new circular yet there is no difficulty with the non-payment of rent. The manager noted that fluctuating income levels and over extentions of credit are greater problems than low income, and that welfare recipients are reliable rent payers because their income is stable.

### III.

The last and most compelling attack on the circular is its reliance on "adjusted" rather than actual income and its use of a rigid formula in computing eligibility. As applied to low income families the formula so distorts the true economic picture of the applicant's financial status as to be without relation to his ability to pay rent. *Cf.* Murry v. U.S. Department of Agriculture, 348 F. Supp. 242 (D.C.1972). While the use of the adjusted income concept might justly be attacked as arbitrary, in the context of a statutory scheme requiring a preference be accorded to the families within the lowest practicable limits it has no place whatsoever.

The *adjusted* income formula was designed to determine whether an applicant's income exceeds the *maximum* level for eligibility prescribed in the statute. 12 U.S.C. § 1715z-1(i)(2); § 236 Hand-

book 18–19. Deductions from income in this context tend to increase the number of persons eligible, although a preference must be accorded the lower income families. When used as a minimum level of income it restricts eligibility

Adjusted income is computed by deducting 5% from actual income for income tax and social security withholding, $300 for each child, and all income earned by minors. No provision is allowed for non-cash income such as food stamps.

1. The 5% deduction for taxes and social security withholding makes no sense when low-income tenants are involved as welfare recipients neither pay taxes nor social security.

2. The formula exludes non-cash benefits such as food stamps, which in the case of a large family may increase actual income as much as 18%. See 36 Fed.Reg. 14118 (July 29, 1971) and even higher if the family pays over 30% of its income for rent. 7 C.F.R. § 271.-3(c)(j)(iii)b, 36 Fed.Reg. 14107 (July 29, 1971). A family of seven with an income of $355 per month would pay $97 for $148 worth of food stamps. Thereby increasing their income 18%. This source of income is stable and easily added to a formula. There is no provision for Medi-Cal health benefits which may also be substantial. The refusal to consider this availability of additional governmental subsidies in appraising a welfare applicant's ability to pay rent has been declared unconstitutional. See Male v. Crossroads Associates, 469 F.2d 616 (2d Cir. 1972).

3. The adjusted income formula also excludes income from minors and requires a $300 deduction for minors who are members of the family and live with the family. This provision stems from 12 U.S.C. § 1715z–1(m) which seems to support the exclusion and deduction required by the circular. The statutory provision, however, was the result of a compromise in setting income limits as a *ceiling* for eligibility. 1968 U. S. CODE CONG. & ADMIN.NEWS p. 3057. It was also a convenient way for reducing the monthly payments required by rental supplemental tenants (25% of income) rather than reduce the percentage of income required to be paid, as the house bill suggested. 1968 U.S.CODE CONG. & ADMIN.NEWS p. 3058. Congress provided no formula based on income as a *floor* for eligibility, and it never intended the exemptions and deductions set forth in 12 U.S.C. § 1715z–1(m) to be incorporated into a rigid formula to that end. It would be a cruel irony if Congress's beneficence toward large families was allowed by this circular to exclude its intended beneficiaries from eligibility in the program.

The most telling condemnation of the use of this formula is that many families including named plaintiffs are paying comparable rents to § 236 projects and living in run-down, inadequate housing.

Under the companion Section 235 homeowership subsidy, HUD issued another circular for determining minimum income level. HPMC–FHA 4040.2. Although HUD has a greater involvement in the processing of applications under § 235, several aspects of the circular are enlightening. First it uses actual income instead of adjusted income and provides " . . . no source of income may be arbitrarily excluded." Second income may be considered adequate if there are certain compensating factors present such as the receipt of food stamps, free medical services, community service organizations benefits (day care), or the absence of an automobile. Third, it gives substantial weight to the demonstrated ability to meet previous housing expenses of comparable magnitude without serious difficulty.

Giving great deference to the objectively demonstrated ability to meet rents comparable to those required in the § 236 projects was originally proposed in attempting to define lowest income prac-

ticable in § 236 projects,[8] but for reasons unclear from the record this suggestion was abandoned in favor of entirely exempting elderly applicants from its purview. In light of H.U.D.'s refusal to allow any flexibility, the eligibility formula is not a reasonable attempt to define lowest practicable limits.

This court will not engage in any piecemeal attempt to deal with the circular or to formulate acceptable guidelines for eligibility, for the statute charges the Secretary with that responsibility. Any attempt on the part of the Secretary to define lowest practicable limits, if promulgated in accordance with the Secretary's own regulations,[9] and in reasonable furtherance of the programs goals will be sustained by this court. HM 4442.18 however is based on a rigid formula which distorts the actual income of low income tenants out of all proportion with their ability to pay rent. Such distortion is not justified as a reasonable attempt to prevent defaults as there is no demonstrated nexus between the presence of low income tenants and the rising number of defaults. The court is left with the unmistakable impression that the effect of this circular is to declare ineligible the very families Congress mandated a preference.

Accordingly H.U.D. circular HM 4442.18 is hereby declared inconsistent with 12 U.S.C. § 1715z–1(i)(1) of the National Housing Act, and the Secretary, his agents, servants, officers, and employees are enjoined from enforcing the circular. It is further ordered that the Secretary or his agents immediately advise all mortgagors and managers of such projects that the minimum income limitations set forth in the above mentioned circular are no longer applicable. For the reasons set forth above defendants' motion in C–72–801 for summary judgment as a matter of law is denied.

---

**8.** Office of Audit Report recommended:
"Establish a specific percentage of rental charge to income to serve as an economic floor for admission to assisted occupancy thereby establishing a minimum income limit for tenant eligibility. Authorize the field office directors to waive the minimum income limitation so established under specific circumstances such as the demonstrated ability of the tenant to pay comparable rents."

**9.** According to 24 C.F.R. § 10.5 (1972) the Department agrees to publish in the Federal Register, thirty (30) days prior to the effective date, any rules or regulations in order to afford interested persons an opportunity to comment unless the Secretary determines that advance notice is impracticable, unnecessary or contrary to public interest. After the commencement of this litigation when it became obvious that this section applied to this circular, and that the regulation had not been complied with, H.U.D. withdrew the circular. Twenty-six days later it republished the circular for immediate effectiveness, the Secretary having determined that the thirty day comment period was impracticable, unnecessary or contrary to public interest. It is doubtful whether publication for immediate effectiveness can be sustained in light of the prior admittedly illegal act. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L. Ed.2d 1012 (1959). This is especially so when the Secretary provides no explanation for his finding. And while no formal finding is required, the absence of any explanation for the use of this "emergency" power to bypass the notice requirement cannot be lightly sustained. Cf. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 at 417, 91 S.Ct. 814, 28 L.Ed.2d 136.