**Dorothy McQUEEN, Petitioner,**

**v.**

**NATIONAL CAPITAL HOUSING AUTHORITY, Respondent.**

**No. 9255.**

District of Columbia Court of Appeals.

Argued Oct. 15, 1975.

Decided Dec. 1, 1976.

10. *Wright v. United States*, D.C.App., 315 A.2d 839, 841 (1974) ; *United States v. Bryant*, *supra*; D.C.Code 1973, § 24–104.

Courtenay Ellis, Washington, D.C., with whom David J. Cynamon, Washington, D. C., was on the brief for petitioner.

Julian Karpoff, Washington, D.C., with whom Annice R. McBryde and James McDaniel, Washington, D.C., were on the brief for respondent. James A. Price, Washington, D.C., also entered an appearance for respondent.

Before KERN, Associate Judge, REILLY, Chief Judge, Retired, and HYDE, Associate Judge, Superior Court of the District of Columbia.*

* Sitting by designation pursuant to D.C.Code 1973, § 11–707(a).

HYDE, Associate Judge:

This is an appeal from a ruling by the National Capital Housing Authority (NCHA) denying petitioner's admission to a low-income homeownership program. Petitioner's original application was turned down, but that action was reversed by a Hearing Examiner; NCHA reversed the Hearing Examiner.

On Auguest 21, 1973, petitioner Dorothy McQueen applied for admission to the Homeownership Opportunity Program D. C. 1–73 (hereinafter D.C. 1–73). The D.C. 1–73 program is administered by NCHA under a national program run by the Department of Housing and Urban Development (HUD) entitled "Low-Rent Housing Homeownership Opportunities" and is more commonly known as the Turnkey III Program (hereinafter Turnkey III). The Turnkey III program allows local housing authorities such as NCHA to provide low-income families with an opportunity to become homeowners through federal assistance taking the form of annual contributions to the various local housing authorities. D.C. 1–73 is designed to enable an individual to eventually purchase a home that he or she initially rents. NCHA acquires the housing project with assistance from HUD and owns all the homes until title is actually transferred to a "home buyer".

The purchase of a home is accomplished by having the home buyer make monthly payments to NCHA which in essence constitutes rent. Each home buyer is also required to pay his or her own utilities every month and perform routine maintenance work. From this monthly payment, NCHA sets up two separate accounts for the home buyer. The first is called the Earned Home Payments Account (EHPA) [1] and the second is the Non-Routine Maintenance Reserve (NRMR).[2] A portion of each monthly payment made by the home buyer is set aside in each of these accounts. The remainder of the required monthly payment goes toward the monthly operating expenses of the project. After the home buyer's EHPA achieves a credit of $200, the home buyer can exercise an option to buy the home he or she occupies. Until the EHPA reaches this amount, the home buyer has the status of a lessee of NCHA with an obligation to build up the necessary balance. In any event, for the purposes of convenience, the occupant is referred to as a home buyer during his status as a lessee.

The amount of a home buyer's required monthly payment, based upon a percentage of the family's income, is set by NCHA. The required monthly payment, plus a monthly allowance for utilities that the home buyer pays directly, has been initially set at an amount equal to 22.5% of "Family Income" as defined by NCHA.[3] Although this figure is adjustable, in no case may it exceed 25% of "Family Income." [4]

---

[1]. Since the home buyer is responsible for maintaining his home, a portion of his required monthly payment equal to NCHA's estimate of the cost of routine maintenance is set aside in the EHPA. If for any reason the home buyer cannot or fails to perform the routine maintenance, NCHA arranges to have the work done and charges the cost to the home buyer's EHPA. There are other ways for the home buyer to build up his EHPA, but we need not concern ourselves with them in this case. Homeownership Opportunity Program D.C. 1–73, § IX, Home Buyer's Monthly Payment, at 22–23 (Aug. 1973).

[2]. The purpose of the NRMR is to provide funds for infrequent but costly items of maintenance and replacement of equipment which may be required over a period of years. Such items include replacing refrigerators, ranges, major repairs to plumbing and electrical systems, etc. *Id.* at 24.

[3]. For our purposes, it is not necessary to go into the technical definitions of "Family Income" because we are given the fact that Mrs. McQueen's family income is $384.80 per month. The technical definition can be found in D.C. 1–73 *supra*, note 1, at § IV, Income Qualifications, at 7.

[4]. *Id.*

The Turnkey III Program is different from an ordinary rental project in that it is a homeownership program designed to be self-liquidating. It is for this reason that the program is structured in such a way that the monthly payments made by all the families in the project must be 10% greater than the "break-even amount".[5] However, NCHA may select home buyers whose monthly payments by themselves will be less than the break-even amount, provided the over-all average is maintained.[6] NCHA has computed the necessary average monthly payment of all the families in the project to be $90 in order to maintain financial feasibility.

The process of determining eligibility for the program involves several steps. First, the family applying must be determined to be within the maximum income level established for the program.[7] Second, a determination is made of whether the family has "potential for homeownership". In order to have "potential for homeownership" a family must be said to have sufficient income to equal the EHPA, the NRMR, and the cost of utilities from its monthly payment. Additionally, at least one member of the family must be gainfully employed or have an established source of continuing income.[8] The final step in the process is to select the actual home buyers from those said to have "potential for homeownership" because they meet the above standards.

NCHA, pursuant to HUD regulations,[9] sets forth specific dollar amounts for home buyer eligibility in its "income qualifications" statement.[10] This statement says that there is no minimum income requirement for individual acceptance into the program. The minimum monthly payment plus the monthly utility cost for each unit, which is approximately $30, is restricted by law to 25% of family income. For the purposes of this program, however, NCHA set that figure at 22.5% of family income.[11]

Petitioner's application for admission to the Homeownership Opportunities Program was denied by the NCHA Selection Committee. Mrs. McQueen's minimum monthly payment was set at $35. In a letter dated October 15, 1973, she was told by the Selection Committee that she was not eligible for the program under federal guidelines because she was unable to meet the required minimum monthly payment of $35 from 22.5% of her net income. The letter also said that neither she nor her spouse was working and that federal regulations required that one of the adult members of the family be either gainfully employed or have an established source of continuing income.

Since March 1971, Mrs. McQueen's sole source of income has been a monthly welfare check in the amount of $384.80. The Selection Committee calculated her net income by multiplying her monthly public assistance check of $384.80 by twelve, thereby arriving at a gross annual income of $4,617.60. This amount was then adjusted by 5% plus another $1,800 for six depend-

---

5. Turnkey III Reg. B, 24 C.F.R. § 1270.108 (1975).

6. *Id.* at § 1270.104(f)(2).

7. *Id.* at § 1270.104(c).

8. *Id.* at § 1270.104(e)(2).

9. *Id.* at § 1270.104(b) and (c).

10. D.C. 1–73 *supra*, note 1, at § IV, Income Qualifications, at 7.

11. The maximum amount that a local housing authority can charge an occupant for rent is limited by statute to one-fourth of family income. However, that does not prevent the National Capital Housing Authority in this case from charging a home buyer less than one-fourth of family income. For reasons known only to itself, NCHA has chosen to use the figure 22.5% of family income in determining eligibility for Turnkey III. Henceforth, when we talk about 25% of family income, it is in connection with the applicable federal statute, and when we talk about 22.5% of family income, it is in connection with the figure chosen by NCHA for purposes of the Turnkey III program.

ents, as required by federal law.[12] This left Mrs. McQueen with a net income of $2,586.72; 22.5% of that figure, which is the maximum NCHA felt it could charge for rent, is equal to $582.01. Dividing that figure by the twelve months of the year comes to approximately $49 per month which Mrs. McQueen had available for shelter costs. Since her utility bills were approximately $31 per month, this left only $18 with which to make the $35 monthly payment. Therefore, she was $17 short.

Until the time she applied for admission to the Turnkey III program, petitioner rented premises from a private landlord. She paid $128 a month for rent, plus utilities ranging from $20 to $24 a month, and petitioner alleges that she was never in arrears on the rent.

Mrs. McQueen also receives food stamps every month worth $218, for which she pays $107, resulting in a net benefit of $111 per month. The value of these food stamps was not considered by the Selection Committee in computing her monthly income in order to determine her eligibility for admission to Turnkey III. This is an important point which will be referred to later.

Subsequent to the rejection of her application for admission to the Turnkey III program, petitioner requested that her application be re-evaluated and asked for a hearing by letter dated December 6, 1973. That request was acknowledged by NCHA, and a hearing was held before a Hearing Examiner on March 14, 1974. On July 11, 1974, the Hearing Examiner reversed the denial of petitioner's application and ordered that she be given first priority for admission to any vacancies in the project.

In overruling the Selection Committee decision, the Hearing Examiner was of the opinion that petitioner's food stamp benefits should be considered income for purposes of eligibility and that failure to take this benefit into account in calculating her income was error. He also found that the 22.5% minimum income requirement violated NCHA guidelines, the National Housing Act, federal case law, and HUD regulations.

NCHA subsequently set the Hearing Examiner's decision aside. In doing so, NCHA stated that the Homeownership Program is essentially different from traditional public housing rental projects, and for this reason it is permissible and appropriate to require an applicant to meet certain minimum income limits. It also overruled the Hearing Examiner's finding that the value of food stamps must be considered in determining family income and further found that the Hearing Examiner had no authority to order that petitioner be given first admission to any vacancies occurring in the project. NCHA held such an order to be an impermissible preference over other applicants who might be more qualified for admission.

Petitioner puts forth two main contentions in arguing that the decision of the National Capital Housing Authority is erroneous. First, she argues that NCHA relied on a minimum income limit in determining her eligibility and that such a minimum income limit is violative of and finds no basis in the United States Housing Act or HUD's regulations governing Turnkey III. Second, appellant argues that even if a minimum income requirement is valid, her right of due process was violated because she was judged ineligible for the program on the basis of an automatic presumption rather than being judged on the merits of her particular case.

Conversely, NCHA argues that its income requirement is not inconsistent with any United States law or HUD regulation. Furthermore, it claims that its concern over the solvency of Turnkey III is a proper justification for a minimum income requirement and that because homeownership is not a constitutional right, each ap-

12. 42 U.S.C. § 1402(1)(B) (1975).

plicant need not be judged on the unique aspects of every particular case. We agree.

The court will first address itself to the validity of the 22.5% income requirement. In its D.C. 1–73 manual, NCHA specifically says that no minimum income requirement is used in selecting home buyers for Turnkey III. In spite of what the NCHA manual says, this court believes that the effect of the 22.5% income requirement is such that it actually is a minimum income requirement that restricts admission into the program. This is so because there are people with incomes so low that 22.5% thereof is not sufficient to meet the monthly payment necessary to obtain entry into the Turnkey III program. Thus, to view the 22.5% figure as anything but a minimum income requirement is contrary to the facts. The questions we must resolve, then, are whether or not this minimum income requirement is valid per se and if so, is it valid in its application by NCHA.

NCHA does not cite any law that requires it to limit the amount of a family's rent to 25% of its income; the only such law pointed out to the court is 42 U.S.C. § 1402, more commonly known as the Brooke Amendment. To determine the validity of NCHA's income requirement, we must determine if the Brooke Amendment is applicable to the Turnkey III program. Though more exhaustive treatments of the subject have been done elsewhere,[13] a concise history of the circumstances surrounding the passage of the Brooke Amendment and the U. S. Housing Act is necessary here to understand their relevancy in this case.

## I. THE BROOKE AMENDMENT

■ The United States Housing Act of 1937[14] established a program of federal aid to local agencies in order to provide decent housing to those who could not obtain it privately. The purpose of the Act was to assist the various states to remedy unsafe, unclean conditions and an acute shortage of decent dwellings for low-income families.

In the 1960's, contracts between the federal government and local housing authorities, under which federal subsidies were given to the local housing authorities to build housing projects, generally provided that the housing projects themselves should be self-supporting. Operating expenses were to be paid from the income of each project. Any operating deficits were to be made up from past surpluses accumulated during prior successful years of operation. By 1969, NCHA had a large operating deficit and applied to HUD for additional money to meet the anticipated deficits of the 1970's. In order to receive help, NCHA was told it would have to devise a rent schedule that would produce enough income in its projects so that they would attain financial feasibility in a few years. Under the proposed rent schedule, minimum rentals would come out to figures which in some cases would be over 40% of a family's income.

■ Congress had a deep concern that families of very low income would be squeezed out of the competition for public housing. In December of 1969, Congress passed the Brooke Amendment which limited the amount of rent that local agencies could charge a family to one-fourth of its income. Congress' intent in passing this amendment was to make sure that the extremely poor families were not shut out from being able to obtain public housing. In order to compensate for the loss of income that was previously available in the form of higher rentals from tenants, Congress authorized HUD to pay the local housing authorities the difference between

13. *Fletcher v. Housing Authority of Louisville*, 491 F.2d 793 (6th Cir. 1974) ; *Thompson v. Washington*, 162 U.S.App.D.C. 39, 497 F.2d 626 (1973).

14. 42 U.S.C. § 1401 et seq. (1937).

operating expenses and the income they received from rents. This allowed the local housing authorities to make up the amount of money attributable to maintenance and operating expenses that exceeded 25% of their tenants' income.

■ The language of 42 U.S.C. § 1401 and § 1402 makes it abundantly clear that a prime feature of public housing programs today is rent limitation and that the purpose of public housing is to make decent, safe and sanitary dwellings available to low-income families. The legislative history of P.L. 91–152, officially known as the Housing and Urban Development Act of 1969, bears this out. Senate Report 91–392 stated that:

> Section 211 of the bill would amend the U. S. Housing Act of 1937 to add a new section 24 which would provide an additional assistance program in behalf of very low-income tenants of public housing projects.

> This section would authorize *rental assistance* payments with respect to units in low-rent housing projects, including low-rent housing in private accommodations, to enable families of very low income to afford rentals with no more than 25% of their incomes. (Emphasis added). Assistance would be in the form of annual payments by the Secretary to public housing agencies pursuant to contracts entered into with the local agencies. Existing as well as new units would qualify for assistance and assistance could be continued for the life of the project so long as it served low-income tenants.

> At the present time, annual contribution payments by the Federal Government to local agencies cover the debt service on private borrowings financing the development or acquisition costs of the projects. Operating and maintenance expenses are payable out of rentals paid by the low-income tenants. . . . [The] costs are too high for the very poor to bear. . . . Local housing agencies have attempted to meet this problem by charging minimum rents for some units below the operating costs attributable to the units, with the higher income tenants making up the difference. This has helped somewhat but not enough. For the most part the neediest families have been excluded from the public housing program.

> This section would enable families, regardless of how low their incomes are, to afford the rentals necessary to support project operating costs with no more than 25 percent of their income. S.Rep.No.91–392, 91st Cong., 1st Sess. 1451–1452 (1969), U.S.Code Cong. & Admin.News 1969, pp. 1524, 1541.

The House Senate Conference Report 91–74 retained the same basic concept of Section 211 of the Senate bill. It did this by generally limiting rents that may be charged public housing tenants to no more than 25% of their income, provided federal funds are available to cover the amount by which the appropriate rental charges exceed 25% of the income of the tenant and to cover the cost of adequate operating and maintenance services.

## II. THE BROOKE AMENDMENT— APPLICABILITY TO TURNKEY III

Petitioner argues that under the Brooke Amendment NCHA is not only limited to charging no more than 25% of a family's income for rent, but may not bar an applicant if his income is so low that 25% of it will not meet the required payments. In our judgment, this application of the Brooke Amendment to the Turnkey III project was not intended by Congress.

In view of the circumstances around which the Brooke Amendment was passed and its legislative history, we can safely conclude that it was intended to apply only to conventional public housing rental projects where maintenance and operating costs are federally subsidized. This court

is aware that the 25% income requirement is being used as a minimum limit or a floor in this case, even though Congress meant the Brooke Amendment to be used as a ceiling on rents when it was passed. The key to this case, however, is the crucial difference between the way a conventional public housing project is run and the way the Turnkey III program is run.

■■■ Petitioner's argument would have more validity in a typical rental public housing project. Congress has by statute created an entitlement to a decent, safe and sanitary *dwelling* for everyone.[15] Federal subsidies make this possible, and the Brooke Amendment makes it possible to extend this benefit to even the poorest low-income families by providing for the additional subsidies that make up the difference between income from rents and operating expenses. The purpose of the relevant statute though, is not to provide everyone with the opportunity to *own* a home, but merely to provide people with a place to live. The language of the statute itself speaks of "dwelling" and does not use the word "home" in the sense of ownership. There is no statutory or constitutional right to homeownership.

The Turnkey III program, on the other hand, enables local housing authorities to provide selected low-income families with an opportunity to actually own their own homes. This enables those families selected to attain something more than they are entitled to by law.

Turnkey III projects are meant to be self-liquidating; additional subsidies to cover operating and maintenance expenses

are not available. Money for those things comes from the participants themselves and is put into the EHPA or the NRMR in the form of part of the home buyer's monthly payment.[16] HUD's intent to make the project self-liquidating is reflected in the language of regulation § 1270.104(f)(2) [17] which requires that the incomes of all selected home buyers result in a required average monthly payment of at least 10% more than the break-even amount for the project.[18] In light of the purpose of Turnkey III and the way it is administered, it is quite rational for NCHA to use the 25% figure as a floor instead of a ceiling.

■■■ To use the 25% figure as a floor in a conventional public housing project would be to deny those who could not pay rent from that portion of their income a right which Congress has conferred on them by statute. To deny persons entrance into the Turnkey III program because they cannot meet monthly payments from a certain portion of their income does not deny them anything that they are entitled to by statute or otherwise. Consequently, in the court's view, the 22.5% minimum income requirement does not violate the United States Housing Act or any of the concepts embodied therein.

## III. DOES APPLICATION OF THE 25% OF INCOME IN TURNKEY III VIOLATE HUD REGULATIONS?

■■■ Likewise, the 22.5% income requirement is not in contravention of any of the HUD regulations governing the operation of Turnkey III, nor are those regulations themselves in violation of any statute

---

15. Congress' declaration of policy is contained in 42 U.S.C. § 1401 (1975). This section declares it to be the policy of the United States "to assist the several States and their political subdivisions" *inter alia* "to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary *dwellings* for families of low income . . . ." (Emphasis added).

16. *Supra*, notes 1 and 2.

17. Turnkey III Reg. B, 24 C.F.R. § 1270.104 (f)(2).

18. *Id.* at § 1270.108 illustrates that the break-even amount means the minimum average monthly amount required to provide funds for items, including such things as administration, project-supplied utilities, protective services, and so forth.

or the Constitution. The court recognizes, as petitioner claims, citing §§ 1270.-104(b)(1) and (2) and 1270.104(f)(2), that the regulations contain a preference for low-income people. However, recognition of that preference does not necessitate declaring the 22.5% income requirement invalid.

Section 1270.104(b)(1) of HUD's regulations reads as follows:

(b) *Eligibility and standards for admission.*

(1) Homebuyers shall be low-income families as determined in accordance with the income definitions and limits established by the LHA and approved by HUD. The HUD-approved standards for admission to low-rent housing, including the LHA's established priorities and preferences and the requirements for administration of low-rent housing under . . . 42 U.S.C. 2000(d), shall be applicable except that the procedures used for homebuyer selection under Turnkey III shall be those set forth in this section. In carrying out these procedures the aim shall be to provide for equal housing opportunity in such a way as to prevent segregation or other discrimination on the basis of race, creed, color or national origin, in accordance with the Civil Rights Act of 1964. (Citations omitted).

What this language means is that home buyers must be picked from within the broad class of people who are considered low-income in accordance with limits established by the LHA and approved by HUD. A home buyer has to be from that class of persons whose income ranges from the lowest that one can have and be entitled to participate in a conventional public housing project to those who have the maximum income that one can have and be able to participate in a public housing project. As long as the home buyer is among this class of people, he is within HUD approved standards for admission, and HUD standards, priorities and preferences are applicable to this extent. However, § 1270.104(b)(1) also says that the actual procedures used for selecting a home buyer shall be those set forth in the section.

Subsection (b)(2) allows the local housing authority to establish income limits for Turnkey III which are different from conventional programs, provided they are in accord with applicable statutory and administrative requirements and approved by HUD.[19] Therefore, the income limits set for Turnkey III are valid as long as the eventual home buyer is from the class just discussed.

Petitioner also relies on § 1270.104(f)(2) of the regulations in her argument regarding a preference for low-income people. That section provides that if there is an applicant who has potential for homeownership but his required monthly payment would be less than the break-even amount, he *may be* selected as a home buyer as long as the income of all selected home buyers is at least 10% more than the break-even amount for the project.[20] Although this particular section of the regulations allows the local housing authority to select particular home buyers whose monthly payments do not meet the break-even point for their particular unit, to do this HUD must balance any deficiencies by selecting as home buyers those whose monthly payment for their particular unit is in excess of the break-even point. Just because the local housing authority does not do this in a particular case, or any case, does not mean they are ignoring a preference for low-income families because in any event, it is only low-income families who are accepted into the program. The overriding consideration of this section of the regulations, and indeed the whole Turnkey III program, is that the financial solvency of the project must be maintained.

19. *Id.* at § 1270.104(b)(2).

20. *Id.* at § 1270.104(f)(2).

This brings us to the question of whether or not NCHA's desire to maintain the financial solvency of Turnkey III justifies the establishment of a minimum income limit. This court is aware of public housing cases in which other courts, including one in this jurisdiction, have either said outright or indicated that trying to maintain the financial solvency of a particular housing project did not justify such things as rent ranges and minimum income requirements.[21] However, this court does not feel that these cases are dispositive of the issue here. One glaring difference makes it impossible to apply the same reasoning. Other courts were dealing with situations where the litigants were entitled to public housing by statute.[22] Here, however, as we previously indicated, there is no entitlement, statutory or otherwise, to homeownership. Having a minimum income requirement for acceptance into the Turnkey III program is not only reasonable in light of its concern with financial solvency, but it does not exclude anyone from obtaining a right to which an individual is legally entitled.

Petitioner argues that the admission procedures of Turnkey III violate the regulations of HUD because they automatically deny admission to a particular class. This is erroneous. Section 1270.104(f)(1) of the regulations, which petitioner relies on to support this argument, is taken out of context. It reads as follows:

(f) *Selection of Homebuyers.* Homebuyers shall be selected from those families determined to have potential for homeownership. Such selection shall be made in sequence from the waiting list established in accordance with this section, provided that the following shall be assured:

(1) Selection procedures that do not automatically deny admission to a particular class; that ensure selection on a non-discriminatory and non-segregated basis . . . .

Petitioner reads this section to mean that NCHA cannot automatically deny admission to any particular class, including that class of people whose income multiplied by 22.5% is not sufficient to meet the minimum monthly payment. That is not what the section says. It says that home buyers are to be those who have been determined to have potential for homeownership. That means that home buyers shall be selected from those families who meet all of the standards set out in § 1270.104(e)(2) relating to potential homeowners. The pertinent part of that section relating to monthly payments is as follows:

(2) *Potential for Homeownership.* In order to be considered for selection, a family must be determined to meet at least all of the following standards of potential for homeownership:

(i) Income sufficient to result in a required monthly payment which is not less than the sum of the amounts necessary to pay the EHPA, the NRMR, and the estimated average monthly cost of utilities attributable to the home . . . .

Reading the two sections in conjunction with one another, we see that NCHA cannot deny selection to a particular class when selecting those who are to become home buyers from those who have already been determined to have homeownership potential. Section 1270.104(f)(2) does not, however, prohibit excluding for lack of homeownership potential that class of people whose income is not sufficient to meet the minimum requirement. In order for petitioner to rely on Section 1270.104(f)(2) for the proposition that NCHA is automatically denying admission to her because she

---

21. *Barber v. White,* 351 F.Supp. 1091 (D. Conn.1972); *National Ten. Or., Inc. v. Dept. of H. & Urban Dev.,* 358 F.Supp. 312 (D. D.C.1973).

22. 42 U.S.C. §§ 1401, 1402 (1970).

belongs to a particular class, she would have had to first qualify under Section 1270.104(e)(2) as having been one of those persons said to have homeownership potential. Since she does not, the argument that the admission procedures discriminate against the particular class she belongs to has no merit.

This section must also be read in conjunction with Section 1270.104(b)(1) and (2). Doing so leads to the conclusion that the concern evidenced by the language regarding discriminating against a class was in regard to discrimination on the basis of race, creed, color or national origin.[23]

Consequently, the court finds as a matter of law that NCHA's 22.5% minimum income requirement is valid and does not violate the HUD regulations.

## IV. IS THE 22.5% OF INCOME REQUIREMENT A CONCLUSIVE PRESUMPTION THAT IS UNCONSTITUTIONAL?

■ We must now turn to the question of whether or not NCHA can use the 22.5% income requirement as a line-drawing procedure, or must it consider each case on an individual basis. Petitioner, relying on several cases, argues that not to look at each case on an individual basis is to apply a conclusive presumption that is unconstitutional.

*Mandina v. Lynn*, 357 F.Supp. 269 (W.D.Mo.1973), was a case brought by a prospective tenant challenging his exclusion as a low-income applicant to public housing. In that case, a tenant had to be able to pay the "basic rent" with not more than 35% of his adjusted income. The basic rent is computed by HUD included utilities and estimated repair and redecoration costs, resulting in a figure of $129. Based on these figures, 37.83% of the applicant's income would be required to pay the "basic rent". If the actual rent, excluding re-

pairs, utilities, etc., had been used in figuring out the rent to income ratio, only 30.8% of the applicant's income would have been required, placing the applicant within the 35% limit. The court held that on the basis of the applicable statutory provision the "basic rent" was the amount required to operate the project and that it could not legally include the amount estimated for utilities, repairs and periodic redecoration. The court went on to say in the form of dicta that the circular providing for the 35% figure was a violation of the Fifth Amendment in that it creates a conclusive presumption that a tenant cannot afford to pay the required rent, regardless of the tenant's actual ability to pay. Its effect is to exclude applicants who have proved to landlords and who are willing to prove to HUD that they have the ability to pay the required rent.

The court in *Mandina* said at 278-79:

Doubtless it is far easier for HUD to use conclusive presumption to dismiss the plaintiff's contentions that he can afford to pay his rent than to evaluate his claims in light of the actual facts. But this is what due process forbids. A conclusive presumption which operates to deny private parties the opportunity to establish a *statutory entitlement* such as that at issue herein has long been deemed unconstitutional. (Emphasis added; citations omitted).

Petitioner also relies on the case of *Findrilakis v. Secretary of Department of Housing and Urban Development*, 357 F.Supp. 547 (N.D.Cal.1973). That case was an action by applicants for tenancy in housing projects and of a non-profit sponsor to have a circular issued by HUD declared unconstitutional. The circular set forth as a mandatory requirement for eligibility in a rental housing project that a prospective tenant's rent to adjusted income ratio be less than 35%. The court held that the circular was not a reasonable at-

23. Turnkey III Reg. B, 24 C.F.R. 104(b)(1) and (2).

tempt to define lowest income practicable. Rather, it excluded from eligibility in projects the very people Congress mandated a preference be accorded to and was inconsistent with the National Housing Act. Plaintiffs in that case were welfare recipients who the court said demonstrated an ability to pay consistently comparable rents to those required in the projects. The court said the adjusted income summary used distorted the true economic picture of an applicant's financial status, so that it had no relation to ability to pay rent. The court determined that the purpose of the adjusted income summary was to help determine if a complainant exceeds the maximum level of eligibility prescribed in the statute, but that the effect of using such an adjusted income is to ignore a statutory preference for low-income families, because using the adjusted summary as a minimum limit restricts eligibility.

Finally, petitioner relies on the case of *Rodway v. U. S. Department of Agriculture*, 168 U.S.App.D.C. 387, 514 F.2d 809 (1975). That case was a suit by low-income households challenging the coupon allotment system of the food stamp program. The allotment system at that time was based on a hypothetical family of four persons. The purpose of the program was to provide recipients with "an opportunity to obtain a nutritionally adequate diet."

Plaintiffs, *inter alia*, claimed that because the allotment system was based on an average family and on average food prices and preferences, and because it did not continually reflect the current cost of food, it did not provide all recipients of food stamps the opportunity to purchase even the least costly of the food plans developed by the United States Department of Agriculture. The court in that case found that the purpose of the Food Stamp Act was to guarantee an adequate diet. Therefore, it said, administrative convenience does not automatically justify ignoring generalized, easily quantified and vertified differences among recipients under the rubric of administrative necessity be-

cause the goals of the Act (health and well-being of the populace) are too important. The averaging system, the court said, could be retained only if the Secretary can show such a system will deliver enough coupons to substantially enable all recipients to buy a nutritionally adequate diet.

The one thing, however, that all these cases have in common which distinguishes them from the case at hand is that in all these cases the plaintiffs were suing over some right that they were entitled to by statute. In *Rodway*, it was the statutory right of those eligible to receive food stamps. In the other cases, it was a statutory right to be admitted into certain rental public housing programs. The crucial and deciding factor that separates those cases from the case at hand is that the petitioner, Mrs. McQueen, has no property right at stake here given to her either by the United States Constitution or by state or federal statute. Such an opportunity is a privilege and not a right.

In *Lindsey v. Normet,* 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), a Supreme Court case involving *inter alia,* an equal protection challenge to an Oregon statute's procedures for possessory actions, the Supreme Court, with respect to the equal protection challenge, said:

> We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality . . . .. Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial functions. *Lindsey v. Normet, supra* at 74–75, 92 S.Ct. at 874.

This passage has been previously cited in the case of *McNeal v. Habib*, D.C.App., 346 A.2d 508 (1975).

*Lindsey* supports the proposition that, as we have stated several times, there is no statutory entitlement applicable to this case that petitioner has shown. Any argument regarding the constitutionality of conclusive presumptions and that petitioner was denied the right to be admitted into a program entitling her to own her own home holds no weight. The injury which petitioner is alleged to suffer by not being admitted to the Turnkey III program is not a substantial deprivation of any right. It is merely the result of her apparent inability to make the necessary monthly payments, weighed against the opportunity of getting into some other type of housing. If petitioner meets the eligibility requirements of a conventional public housing project, this court foresees no reason why she should not be able to get into such a project.

Any argument based on the theory of a due process violation is not applicable to this case. The Supreme Court has said the requirements of procedural due process apply only to deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Parenthetically, the Fifth Amendment is directly applicable to the District of Columbia, unlike the situation in the states, where its guarantees must be applied through the Fourteenth Amendment.

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely on their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg v. Kelly, supra,* had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility, But we held that they had a right to a hearing at which they might attempt to do so. 408 U.S. at 577, 92 S.Ct. at 2709.

In order to test whether there has been some deprivation of a right under the due process clause, there must be some right given by law, and there is none in this case that would entitle petitioner to have her case looked at on an individual basis to assure that she was being given the opportunity to establish something she had a right to.

■ We must consider petitioner's claim that she was entitled to have the financial benefit from her food stamps credited to total income. Ostensibly, with that increase in her income, petitioner's application may have been accepted. We find NCHA was correct in not including this benefit in computing her income.

The *Findrilakis* case which was cited by petitioner to support such a proposition came from a case which did not, in fact, stand for such a proposition. In talking about adjusted income, in *Findrilakis* the court stated that no provision is allowed for non-cash income such as food stamps, which may increase actual income as much as 18% and that the refusal to consider this availability of additional government subsidies in appraising a welfare recipient's

ability to pay has been declared unconstitutional.

In making the statement that the refusal to consider additional government subsidies such as food stamps is unconstitutional, the court directly cited the case of *Male v. Crossroads Associates,* 469 F.2d 616 (2d Cir. 1972), for support. The court in that case held that where supplemental *shelter* allowances were available to welfare recipients and were routinely granted, the refusal of rental agents to consider welfare recipients as applicants for apartment vacancies on the ground that their base shelter allowance was insufficient to pay rent was a denial of equal protection. This case, relied on in *Findrilakis* for the proposition that food stamps should be included in considering income, does not support that proposition.

In the situation in *Male v. Crossroads,* special supplementary *shelter* allowances were available; benefits from food stamps were not in issue. That differs from the idea apparently proposed in *Findrilakis* of taking food stamp benefits and including them in income in order to apply the food stamp benefits to the question of ability to pay rent. This was not the purpose of the Food Stamp Act, as food stamps were supposed to be used for the purchase of food only. Therefore, the *Findrilakis* court was wrong in stating that it was unconstitutional not to include government food subsidies in determining one's ability to pay rent.

Furthermore, the NCHA statement of policies specifically excludes any excess value from allotments of food stamps in computing family income.[24] That section of the manual relies for authority on the food stamp statute itself which reads in pertinent part as follows:

> The value of the coupon allotment provided to any eligible household which is in excess of the amount charged such households for such allotment shall not be considered to be income or resources for any purpose under any Federal or State laws including, but not limited to, laws relating to taxes, welfare, and public assistance programs. *7 U.S.C. §* 2016(c) (1970).

Finally, having resolved all the issues in this case in favor of NCHA, it is unnecessary to decide the question of whether the petitioner can be given priority on a list of applicants for admission to the Turnkey III program.

*Affirmed.*

24. NCHA Manual, § X(L)(2)(D) (Jan. 2, 1974).