Louise FERGUSON et al.

v.

The METROPOLITAN DEVELOPMENT AND HOUSING AGENCY et al.

No. 78-3197.

United States District Court,
M. D. Tennessee,
Nashville Division.

March 5, 1980.

Russell J. Overby, Robert L. Ray, G. Gordon Bonnyman, Peter Komlos-Hrobsky, Nashville, Tenn., for plaintiffs.

James R. Kniffen, Nashville, Tenn., for defendants.

## MEMORANDUM

WISEMAN, District Judge.

Plaintiff instituted this action pursuant to 42 U.S.C. § 1437f, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201–2202, and the Fourteenth Amendment to the United States Constitution. She challenges the policy of defendants Metropolitan Development and Housing Agency [MDHA][1] and Jack D. Harrington, Executive Director of MDHA,[2] of terminating rent subsidy benefits under section 201(a)(8) of the United States Housing and Community Development Act of 1974, 42 U.S.C. § 1437f [hereinafter referred to as "Section 8"], without providing a pretermination hearing, and terminating and denying these benefits for the sole reason of alleged prior indebtedness to MDHA unre-

lated to the Section 8 program. Jurisdiction is conferred on this Court by 28 U.S.C. § 1343(3).

The named plaintiff entered into a lease agreement, effective May 1, 1977, with a private landlord after defendant MDHA certified her as eligible for federal rent subsidies under the Section 8 program.[3] She and her two children subsequently moved into the approved apartment, where they continue to reside. Plaintiff had previously lived in a public housing project operated by MDHA. After vacating that apartment in October of 1975, she was informed that she owed MDHA $227.88 for physical damage to her apartment, although plaintiff contends that the apartment was in good condition when she left. In October of 1977, plaintiff was notified by MDHA of its policy that former MDHA tenants are ineligible for Section 8 assistance if they owe MDHA money resulting from the prior tenancy. Plaintiff was told that she would continue to receive Section 8 assistance until the anniversary date of her lease agreement but that such payments would be discontinued thereafter unless she paid her prior debt to MDHA. In April of 1978, MDHA informed plaintiff that the assistance payments would be discontinued as of April 30, 1978, because of her failure to provide requested information for income verification.

As a result of plaintiff's motion for a temporary restraining order filed with her complaint on May 15, 1978, this Court ordered that the defendants refrain from terminating plaintiff's Section 8 housing benefits until a preliminary injunction hearing could be conducted. The parties subsequently agreed to the entry of a preliminary injunction until further order of the Court. Plaintiff then filed a motion for class certification pursuant to Rule 23 of

---

1. Defendant MDHA is a local agency whose officers and employees are charged with the administration of the Section 8 housing rent subsidy program in Davidson County, Tennessee.

2. By agreed order entered February 7, 1980, Jerry Nicely, in his official capacity as the cur-

rent Executive Director of MDHA, was substituted for former Executive Director Jack D. Harrington.

3. The history and purpose of the Section 8 program will be discussed *infra*.

the Federal Rules of Civil Procedure, and a motion for preliminary injunction or, in the alternative, pursuant to Rule 65(a)(2), to consolidate the hearing on her motion for a preliminary injunction with a hearing on her motion for summary judgment. On October 20, 1978, this Court conducted a hearing, at which time the Court approved an agreed order of class certification. Two classes, both represented by the originally named plaintiff, were certified. Class I is comprised of all persons who presently are, have been, or in the future will be terminated from the Section 8 housing program, without being given a prior opportunity for a hearing. Class II is composed of all persons who are, have been, or in the future will be barred from participation in the Section 8 housing program because of an alleged prior indebtedness to defendant MDHA unrelated to the Section 8 housing program. At the conclusion of the same hearing, the Court also enjoined defendants from terminating, denying, or in any manner barring any beneficiary of or any applicant for Section 8 housing benefits due to an alleged prior indebtedness not connected to the Section 8 housing program. On March 16, 1979, the Court heard arguments on plaintiffs' restated motion for summary judgment.

From the arguments of counsel and evidence submitted in this case, the Court finds that plaintiffs have met their burden of showing that they are entitled to summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The only material factual questions in this case are whether or not defendants exclude persons from the Section 8 housing program because of prior indebtedness unrelated to the Section 8 program and what, if any, pretermination procedures the defendants provide prior to termination of participants in the Section 8 program. Since the answers to these questions are matters of record and not disputed and since all other questions herein concern the legal effect of these facts, summary judgment is proper.

Based on the evidence presented in this case, it is the holding of this Court that defendant MDHA attempted to terminate the named plaintiff from participation in the Section 8 program, at least in part, on the basis of her failure to pay an alleged debt owed to MDHA unrelated to the Section 8 program. It is also clear that it is defendants' established policy to find applicants ineligible for Section 8 assistance if they owe MDHA money as a result of past tenancy.[4] It is further apparent that the named plaintiff was not afforded an opportunity for a hearing prior to termination of Section 8 assistance and that MDHA does not provide pretermination hearings to persons currently participating in the Section 8 program.

Congress first instituted the conventional public housing program in the National Housing Act of 1934, 12 U.S.C. §§ 1701 *et seq.* In the Housing Act of 1937, the federal policy of providing decent, safe, and sanitary housing for low income families was articulated as follows:

> It is . . . to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit . . . to remedy the unsafe and insanitary (sic) housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in urban, rural nonfarm, and Indian areas, that are injurious to the health, safety, and morals of the citizens of the Nation. . . .

42 U.S.C. § 1401 (1969). This policy was expanded and strengthened by the Housing Act of 1949, 42 U.S.C. §§ 1441 *et seq.*, and reaffirmed in the Housing and Urban Development Act of 1968, 42 U.S.C. § 1441a.

---

4. In his letter to the named plaintiff, dated October 19, 1977, attached to defendants' answers to plaintiff's first set of interrogatories as collective Exhibit A, Lance Fleming, Housing Assistance Coordinator, stated:

> Our finance department has recently brought to my attention that you vacated one of our agency's family projects, in 1975, owing a balance of $227.88. Under the agency's policy of not permitting a family to move back into public housing until all unpaid balances have been cleared, you should have been determined ineligible for the Section 8 Program. *See also* note 8 *infra.*

Since 1934, Congress has enacted many programs to increase the supply of decent housing for low and moderate income families. Among those programs are the section 221(d)(3) Below Market Interest Rate [BMIR] program of the Housing Act of 1961, 12 U.S.C. § 1715*l*(d)(3), which provides federal mortgage insurance and subsidized interest payments to owners. Tenants in projects subsidized pursuant to section 221(d)(3), and section 236 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1715z–1, may receive rent supplement payments under section 101 of the Housing and Urban Development Act of 1965, 42 U.S.C. § 1701s, and section 212(2) of the Housing and Community Development Act of 1974, 12 U.S.C. § 1715z–1.

In the enactment of the Section 8 program, Congress asserted an additional goal of promotion of economically mixed housing:

> For the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing, newly constructed, and substantially rehabilitated housing in accordance with the provisions of this section.

42 U.S.C. § 1437f(a). The Section 8 program is comprised of several subprograms, including new construction, substantial rehabilitations, and existing housing. The present case involves the statutory provisions and federal regulations surrounding the existing housing program.

The Section 8 Existing Housing Program provides rent subsidies for lower-income families through the payment of housing assistance payments to owners of existing rental units. The program is administered by public housing agencies [PHAs], pursuant to annual contribution contracts entered into with HUD. *See* 24 C.F.R. §§ 882.116, 882.201–.206 (1979).

Under the terms of the annual contributions contract, the PHA issues a Certificate of Family Participation [CFP] to any applicant who qualifies as an Eligible Family, that is, a family whose income does not exceed 80 percent of the median income for the area. 42 U.S.C. § 1437f(f)(1); 24 C.F.R. § 882.102 (1979). The Certificate of Family Participation certifies, *inter alia*, that its holder is authorized to participate in the Section 8 Existing Housing Program. 24 C.F.R. § 882.102 (1979).

Operating under a policy known as "Finders-Keepers," the holder of the certificate is responsible for finding an existing housing unit within the PHA's jurisdiction. 24 C.F.R. § 882.103 (1979). When the certificate holder finds a suitable rental unit and the owner is willing to participate in the program, the PHA must inspect the unit for compliance with federally established housing quality standards. 24 C.F.R. §§ 882.109, 882.116(o) (1979).

Thereafter, the owner of the rental unit and the holder of the certificate must submit a lease to the PHA for its approval. 24 C.F.R. §§ 882.116(j), 882.210 (1979). The terms of the lease are substantially controlled by federal regulations. 24 C.F.R. §§ 882.106–.108, 882.112 (1979).

The contract rent cannot, absent special circumstances, exceed the federally determined "Fair Market Rent" for the area, and it must be reasonable in relation to rents being charged for comparable units in the private unassisted market. 24 C.F.R. § 882.106 (1979). The tenant's contribution toward rent is computed by the PHA on the basis of the family's income. This amount is between 15 and 25 percent of the family's net adjusted annual income, depending on the size of the family and its income level. 24 C.F.R. §§ 889.101–.105 (1979). The owner of the rental unit and the PHA execute a housing assistance payment contract wherein the PHA agrees to pay the owner the difference between the contract rent and the amount of rent payable by the family. 24 C.F.R. § 882.105 (1979).

The PHA's ongoing responsibilities after execution of the lease and the housing assistance payment contract include, *inter alia*, periodic inspection of the dwelling unit at least annually, 24 C.F.R. § 882.211 (1979); reexamination of the family's income, composition, and extent of exceptional medical

or other unusual expenses, 24 C.F.R. §§ 882.116(m), 882.212 (1979); redetermination of the amount of rent payable by the family and the amount of the housing assistance payments, 24 C.F.R. § 882.116(n) (1979); authorization of eviction actions, 24 C.F.R. §§ 882.116(p), 882.215 (1979); issuance of Certificates of Family Participation to families who elect to transfer dwelling units, 24 C.F.R. § 882.209(e) (1979); and terminating benefits to ineligible families, 24 C.F.R. § 882.212 (1979).

## I. DENIAL OF PARTICIPATION IN THE SECTION 8 HOUSING PROGRAM WITHOUT AN OPPORTUNITY FOR A PRETERMINATION HEARING DEPRIVES PARTICIPANTS OF AN ESSENTIAL, PROTECTED PROPERTY INTEREST WITHOUT DUE PROCESS OF LAW.

The due process clause of the Fourteenth Amendment prohibits the states from depriving any person of "life, liberty, or property," without "due process of law." The modern analysis of the application of the due process clause to denial of public assistance benefits is set forth in the landmark case of *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

 It is not disputed that defendants' conduct of terminating persons under the Section 8 program for prior indebtedness without pretermination hearings constitutes state action within the meaning of the Fourteenth Amendment. *See Owens v. Housing Auth. of Stamford,* 394 F.Supp. 1267, 1272–73 (D.Conn.1975). It is similarly undisputed that denial of benefits by local administrators of federal housing programs, like denial of other forms of public assistance, is a denial of an interest protected by the Fourteenth Amendment and therefore falls within the *Goldberg* analysis. In holding that public assistance benefits are "a matter of statutory entitlement" protected by due process requirements, the *Goldberg*

Court laid to rest the controversy about whether such benefits are "privileges" or "rights." 397 U.S. at 262, 90 S.Ct. at 1017, 25 L.Ed.2d at 295–96.

In determining when due process requires notice and a pretermination hearing and what trial-type protections must be afforded at the hearing, *Goldberg* adopted a balancing test. The Court must weigh, on one hand, the urgency of the private interest in question coupled with the governmental interest in protection of its citizens who receive public assistance. On the other hand, the Court must consider the governmental interest in administrative efficiency and conservation of administrative resources.

Although the governmental interest in administrative economy does not usually vary, in the present case the potential administrative burden that would result from requiring pretermination proceedings is relatively light because similar procedures already exist and are familiar to the defendants in the public housing context. *See* 24 C.F.R. §§ 866.50–.59 (1979).[5]

In contrast to administrative economy and efficiency, the more variable factor in determining due process requirements is the private interest. In *Goldberg*, in which the private interest consisted of federal welfare benefits, the Court held that the private interest outweighed the governmental interest in administrative economy. When the private interest involved relates to the very livelihood of the eligible recipient, "[t]he stakes are simply too high" and the potential for irreversible damage that even "honest error" might produce is too great to be protected adequately by anything less than a full pretermination hearing. 397 U.S. at 266, 90 S.Ct. at 1019, 25 L.Ed.2d at 298, *quoting Kelly v. Wyman,* 294 F.Supp. 887, 904–05 (S.D.N.Y.1968). *Goldberg* enumerated other areas of such essential need, including "food, clothing, *housing,* and medical care." 397 U.S. at 264, 90 S.Ct. at 1018, 25 L.Ed.2d at 297 (emphasis added).

**5.** Tenants residing in MDHA housing projects are afforded grievance hearings in accordance with these federal regulations, which require the opportunity for hearings when a PHA takes action that adversely affects the tenants' rights under their leases.

■ After concluding that some sort of pretermination hearing was necessary, *Goldberg* considered the issue of what trial-type protections should be required at that hearing to comply with due process. A fair hearing must include an opportunity to be heard "at a meaningful time in a meaningful manner." *Id.* at 267, 90 S.Ct. at 1020, 25 L.Ed.2d at 299, *quoting Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965). *See also Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32 (1976). *Goldberg* held that, in the welfare context, a meaningful hearing must include: (1) timely and adequate notice detailing the reasons for termination; (2) an opportunity to appear personally at the hearing, present evidence and oral arguments and confront and cross-examine adverse witnesses; (3) the right to be represented by counsel; (4) a right to a decision rendered by an impartial decisionmaker; (5) a right to have that decision based solely on rules of law and the evidence presented at the hearing; and (6) a right to a statement by the decisionmaker setting forth the reasons for the decision and the evidence upon which it was based. 397 U.S. at 267–71, 90 S.Ct. at 1020–22, 25 L.Ed.2d at 299–301.

Later cases have tailored different protections to the needs of different proceedings. Nonetheless, *Goldberg* still provides the essential standard for a hearing on termination of public assistance benefits relating to the livelihood and survival of the participant. These protections are essentially the same as those set forth in the Appendix.[6]

Since *Goldberg*, the balancing test has been elaborated to apply to different procedural settings. The most significant refinement of the *Goldberg* analysis in the public assistance context is found in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

In *Mathews*, the Supreme Court held that several additional factors should be considered in determining whether or not a particular private interest is of an essential nature. The first factor is whether or not the determination of eligibility for the public assistance in question is based in part on the need of the recipient. *Id.* at 340–41, 96 S.Ct. at 905–06, 47 L.Ed.2d at 36–37. In other words, the Court must decide whether entitlement to the benefit in question depends on inability to obtain that assistance elsewhere or whether it is a right to which the program participant is entitled regardless of his or her other financial resources. In *Mathews*, which involved denial of social security disability benefits, eligibility was not based on need. In contrast, in the present case, as in *Goldberg*, eligibility is based on financial need. In fact, without the federal housing programs, the members of the plaintiff class would have great difficulty obtaining housing.

The second factor introduced by *Mathews* is the extent to which eligibility is based on questions of fact that require an oral pretermination hearing for adequate resolution. *Id.* at 343–45, 96 S.Ct. at 907–08, 47 L.Ed.2d at 38–39. The *Mathews* Court found that conditions of eligibility for social security disability benefits present largely routine questions of law and the adequacy of medical documentation and that therefore an extensive factfinding hearing is not necessary. Conditions of eligibility presented in *Goldberg* and in the present case, however, involve factual questions of financial need. These questions both lend themselves to error and require consultation with the program participant to resolve.

Finally, the *Mathews* Court was concerned with the adequacy of the existing

---

6. In addition to outlining the procedures for pretermination hearings, Attachment A sets forth the "good cause" standard for terminations that is consistent with federal public housing regulations that allow termination of a public housing lease for serious or repeated violations of material terms of the lease. 24 C.F.R. § 866.4(1)(*l*) (1979). It has been consist-ently recognized that due process dictates that a tenant of federally subsidized housing may be terminated from benefits only for cause or good cause. *Joy v. Daniels*, 479 F.2d 1236, 1241–42 (4th Cir. 1973); *McQueen v. Druker*, 317 F.Supp. 1122, 1130–31 (D.Mass.1970), *aff'd on other grounds*, 438 F.2d 781 (1st Cir. 1971).

procedures. *Id.* at 345–46, 96 S.Ct. at 908, 47 L.Ed.2d at 39–40. In holding that full *Goldberg* hearings were not necessary in the disability context, the *Mathews* Court took careful note of the elaborate protections that already existed for disability recipients. This is a very different situation from that created by an absence of pretermination hearings in the Section 8 housing context. *See Watkins v. Mobile Housing Bd.,* No. 79–0067–P, at 7 (S.D.Ala. May 14, 1979).

Several courts have applied the *Goldberg* principles to factual situations similar to the one before this Court. In *Caulder v. Durham Housing Auth.,* 433 F.2d 998 (4th Cir. 1970), *cert. denied,* 401 U.S. 1003, 91 S.Ct. 1228, 28 L.Ed.2d 539 (1971), and *Escalera v. New York City Housing Auth.,* 425 F.2d 853 (2d Cir.), *cert. denied,* 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970), the courts held that a pretermination hearing must be held before eviction from public housing projects. The *Caulder* court found that the private interest of the public housing resident is such that improper denial of the benefit cannot be corrected easily at a later date and that therefore due process protection must be afforded. The court appropriately analogized the deprivation of public housing to the loss of welfare benefits in *Goldberg* and, in so doing, foreshadowed the distinction made in *Mathews* between degrees of potential deprivation and the relative needs of recipients and access to alternative sources of assistance once benefits are terminated.

Like the present case, both *Caulder* and *Escalera* involved disputes over the rights to and under the initial lease. Also like the instant case, both *Caulder* and *Escalera* presented situations in which alternative state law remedies were inadequate. In the case at bar, the defendants are not required to go to state court at all since only termination of Section 8 benefits, and not eviction, is involved. Of course, as a practical matter, termination of Section 8 benefits would make it difficult, if not impossible, for the tenant to meet rent payments without assistance. Whereas the ability to defend in a state court action for eviction was limited in *Caulder* and *Escalera,* in this case there is no opportunity at all. Absent an appropriate due process administrative procedure, the defendants can simply terminate at will with no review by a state court at all. *See Caulder v. New York City Housing Auth., supra,* at 1002; *Escalera v. New York Housing Auth., supra,* at 865–66.[7]

Other courts have addressed the issue of what due process is required in specific cases involving federal housing assistance. Although holding that full *Goldberg* evidentiary-type hearings are not required, the Court of Appeals for the Second Circuit found that nonowner occupants of dwellings whose mortgages were insured by the Federal Housing Administration [FHA] are entitled to participate to some extent in the FHA decision that leads to eviction. *Caramico v. Secretary of Dep't of Housing & Urban Dev.,* 509 F.2d 694, 701–02 (2d Cir. 1974). Some courts have held that even the private interest in rent increases is great enough in the low-income housing context to require some pre-increase protections. *Thompson v. Washington,* 162 U.S.App.D.C. 39, 497 F.2d 626 (D.C.Cir.1973); *Burr v. New Rochelle Mun. Housing Auth.,* 479 F.2d 1165 (2d Cir. 1973). Although full *Goldberg* pre-increase hearings were not required, both courts held that tenants had the right to participate in the decision. Such participation must, at a minimum, consist of an opportunity to submit written objections after receipt of due notice of the

---

7. While the existence of adequate state remedies may not, by itself, be enough to relieve a public housing authority of the burden of providing pretermination hearings, *Owens v. Housing Auth. of Stamford,* 394 F.Supp. 1267, 1273 (D.Conn.1975), it has been held that a pretermination hearing may not be required when state law provides substantial pretermination remedies. *See Joy v. Daniels,* 479 F.2d 1236, 1242–43 (4th Cir. 1973). The *Joy* court, however, made it clear that it did not intend to overrule *Caulder.* 479 F.2d at 1242. The protections afforded by the state court in *Joy* coupled with the practice of evicting tenants only after due process was satisfied were in contrast to the state summary proceedings available in *Caulder* and *Escalera. Id.* at 1242–43 n. 14.

proposed increase. The courts distinguished *Goldberg*-type cases from rent increase cases that involve an entire class of tenants and in which relevant evidence would consist of complex technical and financial data that would easily lend itself to written form. In contrast, cases in which courts have found that due process mandates a predecision hearing involve individualized determinations that require oral presentations. *Thompson v. Washington, supra,* at 640–51; *Burr v. New Rochelle Mun. Housing Auth., supra,* at 1169.

Finally, recent cases have specifically addressed the necessity for pretermination hearings in the Section 8 context. In granting plaintiff's motion for a preliminary injunction, *Watkins v. Mobile Housing Bd.,* No. 79–0067–P (S.D.Ala. May 14, 1979), held that full *Goldberg* protections were necessary before terminating the benefits of a program participant who allegedly shared the apartment with persons unauthorized by the lease. In so holding, the court specifically held: (1) that the interest of the program participant was such that irreparable harm would result if the participant were not afforded a pretermination hearing; (2) that the burden on the housing agency of providing such hearings was relatively light; (3) that public interest in the purposes for which the Section 8 program was created would be best served by requiring the pretermination hearing; and (4) that, therefore, full hearings would be required, including written notice, a right to an impartial decisionmaker, a right to counsel, a right to confront and cross-examine witnesses, a right to present oral and written evidence, a right to a decision, based on the evidence presented, that explains the reasons for the decision, and a right to appeal.

In a similar vein, the court in *Cortez v. Housing Auth. of Corpus Christi,* No. C–79–30 (S.D.Tex. Apr. 16, 1979), considered the question of pretermination hearings in the Section 8 context, and again the substantive issue was unauthorized persons living in the apartment. The *Cortez* court also found *Goldberg* to be the controlling authority and required a pretermination hearing. *See also Brezina v. Dowdall,* 472 F.Supp. 82 (N.D.Ill.1979).

## II. DEFENDANTS' POLICIES IMPOSE CONDITIONS OF ELIGIBILITY NOT AUTHORIZED BY AND IN VIOLATION OF THE PURPOSES OF THE SECTION 8 HOUSING PROGRAM.

■ Defendants' policy of excluding persons alleged to have prior debts to MDHA from the Section 8 program[8] in effect constitutes an unauthorized collection practice, precluding from the program people who have had trouble paying rent, who are the very persons whom the Section 8 program was intended to help. By so doing, the defendants' policy violates the stated purpose of the statutes, regulations, and legislative history creating the program.

The general purpose of the Section 8 program is to "[aid] lower-income families in obtaining a decent place to live and . . . promot[e] economical mixed housing . . .." 42 U.S.C. § 1437f(a). To this end, Congress created very specific eligibility criteria clearly intended to limit the discretion of the PHA in determining who may participate in the program. The Senate report on the Section 8 bill states:

> Eligibility for participation by a low-income family in the program set out in this section will be determined by whether such family has a gross annual income which is not more than four times the annual fair market rental established by the Secretary or a public housing agency for a dwelling unit suitable in size to the housing needs of such family. . . .

---

**8.** The present policy is stated as: "Former tenants who owe the MDHA a balance from a prior occupancy will not be considered for admission until the account is paid in full. . . ." Statement of Policies Governing Admission to and Continued Occupancy of the HUD-Aided

Section 8 Housing Assistance Payments Program (Existing Housing) Administered by the Metropolitan Development and Housing Agency § IV(B)(7), at 13 (Collective Exhibit E to defendants' answers to plaintiffs' first set of interrogatories).

S.Rep. No. 93–693, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 4273, 4315.

An intent to make these criteria exclusive and to limit the discretion of state agencies in deciding who may participate in the program is reflected in the Annual Contributions Contract [ACC], which authorized MDHA's participation in the program. Sections 2.2 and 2.3 of the ACC state:

2.2 Lower-Income Housing Use; Compliance with Act and Regulations. *The PHA shall use the Annual Contribution solely for the purpose of providing Decent, Safe, and Sanitary dwellings for Families in compliance with all applicable provisions of the Act and all regulations issued pursuant thereto.*

2.3 Eligibility and Amount of Housing Assistance Payments.

(a) The PHA shall comply with the Income limits established by the Government, and with the requirements of the Government pursuant to section 8(c)(7) of the Act that at least 30 percent of the Families assisted in all its Projects under its Master Section 8 ACC shall be Very Low-Income Families.

(b) The PHA shall comply or assure compliance with the schedules and criteria established by the Government with respect to the amounts of housing assistance payments made on behalf of Families.

(emphasis added).

Further, paragraph 2.5(c) of the ACC makes it clear that classes of individuals, such as the individuals comprising Class II, may not be excluded from participation in the Section 8 housing program because of their membership in a class. That provision states in relevant part that:

The PHA shall not . . . deny to any eligible applicant the opportunity to lease or rent any dwelling in any such housing suitable to its needs. No person shall automatically be excluded from participation in or denied benefits of the Housing Assistance Payments Program because of membership in a class such as unmarried mothers, recipients of public assistance, etc.

The regulations also provide that the family must comply with its obligation under its Certificate of Family Participation [CFP]. Section 7 of the CFP obligates the family to: "(a) provide such Family income information and records as may be required in the administration of the program, (b) permit inspection of its dwelling unit at reasonable times after reasonable advance notice, and (c) give at least 30 days notice to the Agency of the Family's intention to vacate the unit." The family has no other obligations to the PHA.

Defendants argued in their brief in opposition to plaintiffs' motion for summary judgment that 42 U.S.C. § 1437f(d)(3) grants them some discretion in selecting program participants. This section states:

Notwithstanding any other provision of law, with the approval of the Secretary the public housing agency administering a contract under this section with respect to existing housing units may exercise all management and maintenance responsibilities with respect to those units *pursuant to a contract between such agency and the owner of such units.*

(emphasis added). Defendants apparently overlooked the last phrase, which limits whatever management and maintenance responsibilities the defendant may be granted to what is contained in the ACC. As discussed above, that grant is narrow indeed.

The discretion in tenant selection that does exist in the program was clearly intended by Congress to be vested in the landlord rather than in the housing authority. Section 1437f(d)(1)(A) of Title 42 states that "the selection of tenants for such units shall be *the function of the owner,* subject to the provisions of the annual contributions contract between the Secretary and the agency."

■ Finally, MDHA's policy of excluding applicants because of prior indebtedness to MDHA conflicts with Tennessee law governing settlement of landlord-tenant disputes. By requiring Section 8 applicants to pay these prior, and often disputed, debts as

a condition of eligibility, MDHA in effect has created an unauthorized collection device that circumvents the procedures and protections provided to both landlords and tenants under Tennessee law. *See* Tenn. Code Ann. §§ 23–1601 *et seq.*; 64–2801 *et seq.*

■ The applicable case law also supports the conclusion that the defendants' actions are improper. In *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), the Supreme Court dealt with the general issue of local welfare policies not authorized by and conflicting with the purposes of the statutes and regulations creating the program. The *King* Court held that, even though local agencies may have a certain amount of discretion in administering federal programs and even though the local policies in question might further a valid state interest, any conflict between local policies and the purpose and scope of the statutes and regulations of a program would render that policy invalid. In other words, the federal government may impose such terms and conditions as it feels proper on disbursement of the monies for a particular program, and policies inconsistent with those conditions cannot stand.

In *Fletcher v. Housing Auth. of Louisville*, 491 F.2d 793 (6th Cir. 1974), the court applied these principles to the housing context in circumstances similar to those presented in the instant case. *Fletcher* involved the question of whether or not the Housing Authority of Louisville [HAL] could institute a policy that, like MDHA's policy herein, imposed unauthorized conditions of eligibility on housing program applicants. The policy in *Fletcher* provided for accelerated entry into public housing of applicants who could pay higher rent than other low-income applicants. The justification used by HAL was that larger revenues could be generated by the housing agency if the policy were enforced and that HAL's financial stability would thereby be strengthened. *Id.* at 795–96. Even though there was no authorization for such a policy in the United States Housing Act of 1937, as amended, 42 U.S.C. §§ 1401 *et seq.*, the

trial court held that the policy represented a rational attempt on the part of the housing agency to deal with its growing financial problems. *Id.* at 795 n.2. The Court of Appeals for the Sixth Circuit reversed on the grounds that HAL's policy violated the purpose of the United States Housing Act of 1937. The court stated:

[I]n contracting with HUD for annual federal subsidies, HAL agreed to function according to the terms of the Act. *Barber v. White*, 351 F.Supp. 1091, 1093 (D.Conn.1972); *Otero v. New York City Housing Authority*, 484 F.2d 1122 (2d Cir. 1973). "When [federal] money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not by the states." *Helvering v. Davis*, 301 U.S. 619, 645, 57 S.Ct. 904, 910, 81 L.Ed. 1307 (1937) (Cardozo, J.). *Cf. Rosado v. Wyman*, 397 U.S. 397, 422–423, 90 S.Ct. 1207, 25 L.Ed. 442 (1970) (Harlan, J., concurring). The expression of federal policy in the area of low-income housing is the National Housing Act of 1937, as amended. So long as HAL operates under an annual contributions contract with HUD, it must meet the requirements of the National Housing Act. *It may not set eligibility criteria unauthorized by Congress. King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

*Id.* at 798–99 (emphasis added) (footnotes omitted).

Specifically the court found that the state agency had no authority to impose its own conditions of eligibility:

In view of the history of the National Housing Act, we conclude that tenant admission policies which discriminate against applicants because of their poverty are no longer justified. Eligibility criteria unauthorized by Congress are not permissible when a state agency dispenses a federally funded benefit. *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Local housing agencies' financial problems must be resolved through negotiations with HUD and by funding decisions of Congress. *Barbar v.*

*White,* 351 F.Supp. 1091 (D.Conn.1972); *National Tenants Organization, Inc. v. Dept. of Housing and Urban Development,* 358 F.Supp. 312 (D.D.C.1973).

*Id.* at 804 (footnote omitted).

### III. SUMMARY AND CONCLUSION.

■ MDHA's practice of terminating participation in the Section 8 program without a pretermination hearing constitutes state action depriving the plaintiff of an essential interest protected by the due process clause of the Fourteenth Amendment. In determining what due process protections are necessary to protect that interest adequately and particularly whether or not pretermination hearings are required, the Court balanced the governmental interest in administrative economy against the private and governmental interest in the welfare of program participants. In the present circumstances, the administrative burden of providing pretermination hearings is relatively light because procedures similar to those that would be required already exist and are familiar to the defendants.

In evaluating the private interest, the Court took into consideration that the interest at issue is of an essential nature relating to the livelihood of the beneficiary, that eligibility for participation in the program is based on the need of the applicant, and that determination of eligibility requires evaluation of factual issues that lend themselves to error and require input from participants to determine. These factors dictate the necessity of a full pretermination hearing for participants in the Section 8 program.

Defendants' policy of excluding persons from the Section 8 program because of prior indebtedness to MDHA unrelated to that program is invalid because it imposes an additional condition of eligibility for the Section 8 program that is not authorized by Congress. The policy conflicts with HUD regulations and with the Annual Contribution Contract. The policy amounts to no more than an illegal private collection service to promote the narrow financial interest of defendant MDHA and thereby circumvents the purposes of the Section 8 program and state law.

For the foregoing reasons, summary judgment for plaintiffs is granted.

### APPENDIX

1. As to the plaintiff Class I, defendants may only terminate the participants of the Section 8 housing program for good cause. Such good cause, as specified in the Certificate of Family Participation, shall be:

A. Serious or repeated violations of a material obligation to MDHA under the Section 8 housing assistance program;

B. Failure to provide such family income information and records as may be required in the administration of the program;

C. Failure of the family to meet the income eligibility guidelines of the Section 8 housing program.

2. Written notice of such good cause reasons for termination shall be provided immediately to those members in the plaintiff Class I who are presently participating in the Section 8 housing program. Persons who have been terminated from the Section 8 housing program in the past will be given notice of such good cause reasons for that termination and notice of the Court's final judgment if their whereabouts are known to defendants. An opportunity to be heard will be afforded these individuals and, if it is determined that they are currently eligible for the Section 8 housing program, they will be offered a Section 8 housing certificate on a priority basis.

3. Upon knowledge or receipt of a complaint of alleged violations, MDHA shall conduct a preliminary interview with the Section 8 participants to effect a solution, utilizing termination only as a last resort.

4. Upon a decision to terminate Section 8 assistance, MDHA shall give a thirty (30) day written notice of its intent to the participant. Such notice shall include:

A. The specific good cause rule or regulation the participant has allegedly violated;

B. Specific description of the nature of the offense against him including, where applicable, dates of violations and the names of witnesses;

C. The participant's right to be represented by counsel at a hearing.

5. Upon receipt of an appeal request, MDHA shall be obligated to conduct a hearing and shall suspend any further action relating to termination until the appeal procedure is completed. MDHA shall give the appellant a written explanation of the hearing procedure and inform the appellant of the hearing date, giving sufficient time to prepare for the hearing, at a time during the working day and at a place convenient to appellant.

6. Hearings may be continued at the request of either MDHA or appellant for good cause, such as illness or other unavoidable absence of a party or witness, or by agreement between MDHA and the appellant.

7. The hearings shall be conducted by an impartial official or officials.

8. The issue at the hearing shall be whether MDHA has good cause to terminate the tenant's Housing Assistance subsidy.

9. For purposes of the hearing, the appellant:

A. Shall have access to all information on which a decision would be based;

B. Have the right to confront and cross-examine adverse witnesses;

C. Have the right to present and establish all relevant facts and circumstances by oral testimony and documentary evidence;

D. Have the right to be represented by counsel.

10. The hearing decision:

A. Shall be based solely and exclusively on the evidence presented at the hearing and upon applicable laws and regulations;

B. Must be in writing, signed, and dated, and must state the findings of fact and the specific reasons for the results;

C. Shall be final and binding on MDHA;

D. Shall be forwarded to the Executive Director of MDHA, the appellant, and the appellant's authorized representative.

11. If MDHA does not comply with these rules set out in this agreement, it shall be precluded from approving any request of any landlord to evict the appellant for failure to pay rent if such failure is due to MDHA's termination of assistance.